**DWORKEN, Plaintiff, v. COLLOPY, Admr., etc., Defendant.**

Common Pleas Court, Franklin County.

No. 178255.   Decided March 27, 1950.

Jack B. Dworken, Morton R. Dworken, Cleveland, for plaintiff.

Hon. Herbert S. Duffy, Atty. Genl., Geo. C. Steinemann, Madison C. Perkins, James B. Dooley, Asst. Atty. Genls., for defendant.

## OPINION

By REYNOLDS, J.

This case is before the Court on plaintiff's petition to restrain defendant as the Administrator of the Bureau of Unemployment Compensation of Ohio, and his agents and deputies from enforcing the provisions of §1345-6 GC, Section d, paragraph 2a, and that said paragraph of said statute be declared invalid as being contrary to the Constitution of the United States and the Constitution of the State of Ohio.

Plaintiff brings this action as a taxpayer on behalf of himself and other taxpayers and charges that the statute in ques-

tion is unconstitutional in that it is an infringement upon the right of free speech, etc., and that its enforcement will lead to great confusion, contention and much litigation, and will undermine the purpose of the Unemployment Compensation Fund to the detriment of the employer who pays money into such fund and the individuals who are supposed to receive the benefits thereof, and that unless restrained, the defendant will proceed to enforce the statutory provisions against indiviudals who are entitled to receive the benefits provided by the Unemployment Compensation Act, and cause the wrongful and illegal expenditures of money in the Unemployment Compensation Fund for the printing, taking and handling of said applications containing the affidavit provided for by paragraph 2a, Sec. d in said statute to the damage of plaintiff and others similarly situated, etc,. and that there is no adequate remedy at law.

Defendant's answer admits plaintiff's status as a citizen and taxpayer and his own official position, admits the allegations of the petition to the effect that prior to May 23, 1949, §§1341-1 to 1346-5 GC inclusive, were in full force and effect and that on or about May 23, 1949, the Legislature of Ohio amended §1345-6 GC by adding sub-section (2a) d and that this section became effective on August 22, 1949, and denies the other allegations of the petition.

In a supplemental petition plaintiff pleads the enactment of Senate Bill 227, effective Oct. 18, 1949, being an amendment to §1345-6 GC to the same effect as the amendment of May 23rd, 1949, plus an additional section known as (2b) and the defendant by answer admits the truth of such allegations.

The case is submitted on the pleadings, a stipulation of facts and briefs which have been filed by counsel.

The following is the stipulation filed herein:

"It is hereby stipulated and agreed by and between counsel representing plaintiff and defendant that the defendant, Frank J. Collopy, as administrator of the Bureau of Unemployment Compensation of Ohio, was at the time of the filing of this action and is now enforcing §1345-6 d 2(a) GC, and has required and is still requiring every person filing a claim for benefits in accordance with §1346-4 GC to attach to such claim his written affidavit stating whether he advocates or does not advocate and whether he is or is not a member of a party which advocates the overthrow of our government by force, and in the absence of such affidavit does not consider such claim to be valid.

It is further stipulated and agreed that the said Frank

J. Collopy as administrator of the Bureau of Unemployment Compensation of Ohio was at the time of the filing of this action and is now spending public money in the printing and handling of the affidavits above referred to as now required by §1345-6 paragraph d 2 (a) GC."

The perinent sections of the statute involved are as follows:

"Sec. 1345-6 GC.
Each eligible individual shall receive benefits as compensation for loss of remuneration due to total or involuntary partial unemployment in the amounts and subject to the conditions stipulated in the unemployment compensation act. * * *d. Notwithstanding the provisions of subsection (a) of this section, no individual may serve a waiting period or be paid benefits for the duration of any period of unemployment with respect to which the administrator finds that such individual (1) * * * (2) * * *

(2a) advocates, or is a member of a party which advocates the overthrow of our government by force. Every person filing a claim for benefits in accordance with §1346-4 GC shall attach to such claim his written affidavit stating whether he advocates or does not advocate, and whether he is or is not a member of a party which advocates, the overthrow of our government by force. In the absence of such affidavit no claim shall be valid;

(2b) The provisions of §1345-6d, (2a), GC, shall apply only to the application for determination of benefit rights and the affidavit provided for therein shall be sufficient for the purpose of said subsection in determining an individual's entitlement to benefit rights and benefits. Such affidavits shall be produced in court by the administrator or his deputy upon order of a judge of any court of record."

It is plaintiff's claim that the Legislature had no power or authority to enact subsections (2a) and (2b) above set out as the same have no relevance to any legitimate purpose of the Unemployment Compensation Act and are an unwarranted discrimination against unemployed workers.

"that said legislation is in the nature of a Bill of Attainder; that the purpose of the Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy and place them beyond the reach of majorities and officials,

and to establish them as legal principles to be applied by the courts. One's right to life, liberty and property, to free speech, among which is the right **to think,** and other fundamental rights, do not depend upon the whims of any officials, high or petty. Therefore, said legislation is in contravention of the Declaration of Independence of the United States of America; contrary to the first amendment of the Constitution of the United States of America; contrary to the **Constitution** of the **State of Ohio, Article One, Section One;** contrary to the Constitution of the United States of America, Fourteenth Amendment; and contrary to the **Constitution** of the **State of Ohio, Article One, Section Eleven.**"

It is urged that the statute is in the nature of a bill of attainder, in that it confiscates the unemployed workers' property by legislative fiat.

In support of this contention chief reliance is had on the case of Cummings v. Missouri, 4 Wall (U. S. 277).

In that case the validity of a constitutional provision in the amendment to the Missouri Constitution adopted in June of 1865 by a popular vote was under consideration. The pertinent parts of that amendment are as follows:

"Sec. 3. At any election held by the people under this Constitution, or in pursuance of any law of this State, or under any ordinance or by-law of any municipal corporation, no person shall be deemed a qualified voter, who **has ever been in armed hostility to the United States, or to the lawful authorities thereof,** or to the government of this State; or has ever given aid, comfort, countenance, or support to persons engaged in any such hostility; or has ever, in any manner, adhered to the enemies, foreign or domestic, of the United States, either by contributing to them, or by unlawfully sending within their lines, money, goods, letters, or information; or has ever disloyally held communication with such enemies; or has ever advised or aided any person to enter the service of such enemies; **or has ever, by act or word, manifested his adherence to the cause of** such enemies, or his **desire for their triumph** over the arms of the United States, **or his sympathy** with those engaged in exciting or carrying on rebellion against the United States; or has ever, except under overpowering compulsion, submitted to the authority, or been in the service, of the so-called 'Conferate States of America;' or has ever left

this State, and gone within the lines of the armies of the so-called 'Confederate States of America,' with the purpose of adhering to said States or armies; or has ever been a member of, or connected with, any order, society, or organization, inimical to the government of the United States, or to the government of this State;; or has ever been engaged in guerilla warfare against loyal inhabitants of the United States, or in that description of marauding commonly known as 'bush-whacking;' or has ever knowingly and willingly harbored, aided, or countenanced any person so engaged; or has ever come into or left this State, for the purpose of avoiding enrollment for or draft into the military service of the United States; or has ever, with a view to avoid enrollment in the militia of this State, or to escape the performance of duty therein, or for any other purpose, enrolled himself, or authorized himself to be enrolled, by or before any officer, as disloyal, or as a southern sympathizer, or in any other terms indicating his disaffection to the Government of the United States in its contest with rebellion, or his sympathy with those engaged in such rebellion; or, having ever voted at any election by the people in this State, or in any other of the United States, or in any of their Territories, or held office in this State, or in any other of the United States, or in any of their Territories, or under the United Sattes, shall thereafter have sought or received, under claim of alienage, the protection of any foreign government, through any consul or other officer thereof, in order to secure exemption from military duty in the militia of this State, or in the army of the United States: nor shall any such person be capable of holding in this State any office of honor, trust or profit, under its authority; or of being an officer, councilman, director, trustee, or other manager of any corporation, public or private, now existing or hereafter established by its authority; or of acting as a professor or teacher in any educational institution, or in any common or other school; or of holding any real estate or other property in trust for the use of any church, religious society, or congregation. But the foregoing provisions, in relation to acts done against the United States, shall not apply to any person not a citizen thereof, who shall have committed such acts while in the service of some foreign country at war with the United States, and who has, since such acts, been naturalized, or may hereafter be naturalized, under the laws of the United States and the oath of loyalty hereinafter prescribed, when taken by any such person, shall be considered as taken in such sense.

Sec. 6. The oath to be taken as aforesaid shall be known as the Oath of Loyalty, and shall be in the following terms:

'I, A. B., do solemnly swear that I am well acquainted with the terms of the third section of the second article of the Constitution of the State of Missouri, adopted in the year eighteen hundred and sixty-five, and have carefully considered the same; that I have never, directly or indirectly, done any of the acts in said section specified; that I have always been truly and loyally on the side of the United States against all enemies thereof, foreign and domestic; that I will bear true faith and allegiance to the United States, and will support the Constitution and laws thereof as the supreme law of the land, any law or ordinance of any State to the contrary notwithstanding; that I will, to the best of my ability, protect and defend the Union of the United States, and not allow the same to be broken up and dissolved, or the government thereof to be destroyed or overthrown, under any circumstances, if in my power to prevent it; that I will support the Constitution of the State of Missouri; and that I make this oath without any mental reservation or evasion, and hold it to be binding on me.'

Sec. 7. Within sixty days after this Constitution takes effect, every person in this State holding any office of honor, trust, or profit, under the Constitution or laws thereof, or under any municipal corporation, or any of the other offices, positions, or trusts, mentioned in the third section of this Article, shall take and subscribe the said oath. If any officer or person referred to in this section shall fail to comply with the requirements thereof, his office, position, or trust, shall, ipso facto, become vacant, and the vacancy shall be filled according to the law governing the case.

Sec. 9. No person shall assume the duties of any state, county, city, town, or other office, to which he may be appointed, otherwise than by a vote of the people; nor shall any person, after the expiration of sixty days after this Constitution takes effect, be permitted to practice as an attorney or counsellor at law, nor, after that time, shall any person be competent as a bishop, priest, deacon, minister, elder, or other clergyman of any religious persuasion, sect, or denomination, to teach, or preach, or solemnize marriages, unless such person shall have first taken, subscribed, and filed said oath.

Sec. 14. Whoever shall, after the times limited in the

seventh and ninth sections of this Article, hold or exercise any of the offices, positions, trusts, professions, or functions therein specified, without having taken, subscribed, and filed said oath of loyalty, shall, on conviction thereof, be punished by fine, not less than five hundred dollars, or by imprisonment in the county jail not less than six months, or by both such fine and imprisonment; and whoever shall take said oath falsely, by swearing or by affirmation, shall, on conviction thereof, be adjudged guilty of perjury, and be punished by imprisonment in the penitentiary not less than two years."

In September of 1865 the Reverend Mr. Cummings, a Catholic priest, was convicted of preaching without having taken the oath and sentenced to pay a fine of $500.00. The judgment was affirmed by the State Supreme Court and the case was appealed to the United States Supreme Court where the judgment was reversed, the Court holding that:

"The clauses of the second article of the Constitution of Missouri, which require priests and clergymen, in order that they may continue in the exercise of their professions, and be allowed to preach and teach, to take and subscribe an oath that they have not committed certain designated acts, some of which were at the time offences with heavy penalties attached, and some of which were at the time acts innocent in themselves, constitute a bill of attainder within the meaning of the provision of the Federal Constitution prohibiting the States from passing bills of that character.  * * * The prohibition of the Constitution was intended to secure the rights of the citizens against deprivation for past conduct by legislative enactment, under any form, however disguised."

The court defines a bill of attainder as a legislative act which inflicts punishment without a judicial trial.

The Court also held that the constitutional provisions were in effect ex post facto laws, and defined an ex post facto law as one which imposes a punishment for an act which was not punishable at the time it was committed or imposes additional punishment to that then prescribed, or changes the rules of evidence by which less or different testimony is sufficient to convict than was then required.

In its opinion the Court said:

"The clauses in the Missouri constitution, which are the subject of consideration, do not, in terms, define any crimes, or declare that any punishment shall be inflicted, but they

produce the same result upon the parties, against whom they are directed, as though the crimes were defined and the punishment was declared. They assume that there are persons in Missouri who are guilty of some of the acts designated. They would have no meaning in the constitution were not such the fact. **They are aimed at past acts, and not future acts.**" (Emphasis ours.) "They were intended especially to operate upon parties who, in some form or manner, by action or words, directly or indirectly, had aided or countenanced the Rebellion, or sympathized with parties engaged in the Rebellion, or had endeavored to escape the proper responsibilities and duties of a citizen in time of war; and they were intended to operate by depriving such persons of the right to hold certain offices and trusts, and to pursue their ordinary and regular avocations. This deprivation is punishment; nor is it any less so because a way is opened for escape from it by the expurgatory oath. The framers of the constitution of Missouri knew at the time that whole classes of individuals would be unable to take the oath prescribed. To them there is no escape provided; to them the deprivation was intended to be, and is, absolute and perpetual. To make the enjoyment of a right dependent upon an impossible condition is equivalent to an absolute denial of the right under any condition, and such denial, enforced for a past act, is nothing less than punishment imposed for that act. It is a misapplication of terms to call it anything else.

Now, some of the acts to which the expurgatory oath is directed were not offences at the time they were committed. It was no offence against any law to enter or leave the State of Missouri for the purpose of avoiding enrollment or draft in the military service of the United States, however much the evasion of such service might be the subject of moral censure. Clauses which prescribe a penalty for an act of this nature are within the terms of the definition of an ex post facto law—they impose a punishment for an act not punishable at the time it was committed."

On page 325 of the opinion the Court said:

"The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against **deprivation for past conduct by legislative enactment, under any form, however disguised.**" (Emphasis ours.)

From a reading of the decision in this case, one can come to no other conclusion, than that if the inhibition related to a present status, the Court's conclusion would have been to uphold its validity. In other words, were the constitutional provisions framed to deprive citizens of certain rights and privileges if they were presently engaged either directly or indirectly in any disloyal activities, the Court most certainly would have held it valid.

It is especially to be noted that the decision in that case was rendered by a divided court and that four of the judges, including the Chief Justice, joined in a strong dissenting opinion.

The difference in the factual situation between that case and the instant case is marked and important. The statutory requirement here under consideration is not an absolute and perpetual bar to unemployed workers from receiving compensation.

It has no relation to past activities or allegiances, but relates simply and only to the present. The condition precedent to participation in the unemployment compensation fund is therefore but a provision that the person seeking the benefits thereof disavow under oath membership in any party which advocates the overthrow of our government by force or the advocacy of such an end.

It must be borne in mind that a beneficiary under the Unemployment Compensation Law has no vested interest therein. He makes no contribution there-to and is only eligible if he meets the requirements and complies with the conditions fixed by the Legislature.

**Sec. 1345-6 GC** provides that:

"Each eligible individual shall receive benefits as compensation for loss of remuneration due to total or voluntary partial unemployment in the amounts **and subject to the conditions stipulated in the unemployment compensation act** * * *." (Emphasis ours.)

Unless the conditions are violative of some right, they must be complied with before benefits may accrue.

It is argued that the condition which is under consideration is violative of the right of free speech as guaranteed by the Constitution of the United States and the Constitution of the State of Ohio.

The Federal Constitution provides in the first amendment thereto the following:

"Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

**Article V, Sec. 11 of the Ohio Constitution** provides as follows:

"Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

It is thus seen that the right of free speech is not an unqualified right. In the exercise thereof one must still be held responsible for the abuse of the right. For instance, if one by speech or written word is guilty of slander or libel, he may be liable therefor as he is if by the exercise of free speech he incites riot or disturbs the peace.

By the provisions of the statute in question, he is not prevented from the exercise of his right to speak, but under certain circumstances it may prevent him from receiving certain benefits which the government he seeks to destroy provides.

What logical reason may be interposed to conclude that the very government which makes it possible for its citizens to enjoy certain benefits, may not withhold those benefits from its avowed enemies and those who seek to destroy it?

It is a well recognized fact that those who most vociferously appeal to all the constitutional and statutory provisions provided to safeguard human rights, are those who violate the laws and then seek immunity from punishment by every legal means which their ingenuity may contrive, and it would seem that those who are most insistent on the exercise of their right of free speech are those who want to use that right to the detriment of others.

It must always be borne in mind that the rights of others are to be considered along with the rights of any individual or any group of individuals.

One's individual and personal rights stop where another's rights begin.

It is a well known fact that there are individuals and organizations in this country who would destroy our government, and whose primary allegiance is to a foreign power

and they insist on all the protections of our Constitution and laws to shield them, while in the promotion of their nefarious plans. Should they succeed, and our form of government be supplanted by one totalitarian in form, then all of the human rights and liberties of which we now boast would be but a memory, and freedom of speech which is now being used in the very effort, the result of which would be to destroy it, would no longer be known.

It is well at this time to consider along with the constitutional guarantees of human rights, the objects and purposes of our government as announced by our founding fathers.

In the Declaration of Independence it was declared:

"That all men are created equal and endowed by their Creator with certain inalienable rights, among which are life, liberty and the pursuit of happiness and that to secure these rights governments are instituted among men, deriving their just powers from the consent of the governed."

In the preamble to our constitution its purpose was stated as follows:

"We the people of the United States, in order to form a more perfect union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this Constitution for the United States of America."

It was clearly intended that the government as thus established was to be perpetuated for the purposes thus enunciated, and that the blessings of liberty were to be fostered and protected through the succeeding generations, so that posterity should continue in that enjoyment.

Therefore, in order that the purposes intended should and may be carried out, a continuing responsibility rests on each succeeding generation to preserve those liberties and to oppose every effort to destroy them. Each individual citizen has his part in that responsibility, which he may not shirk if he is to be worthy of his heritage. As a beneficiary of the sacrifices which were made to establish this nation, one should certainly be proud to pledge his allegiance on all opportune occasions and by his conduct proclaim to the world his worthiness to enjoy the freedom which our government guarantees. In these present parlous times one should be willing to stand up and be counted as a loyal citizen, and

when anyone protests to be so counted, as being an infringement on his constitutional rights, he immediately draws suspicion upon himself and raises doubts as to his loyalty and his worthiness to enjoy those rights which he thus asserts.

We should be at least as zealous to preserve the blessings of liberty for those who come after us as we are to accord them to those now presently enjoying them.

In the last analysis, unemployment compensation is a gratuity furnished by the state, from a fund paid in by the employers and to which the worker makes no contributions and the privilege to participate therein has been made conditioned upon the recipient not being engaged in efforts to destroy the very source from which he seeks that gratuity.

If he is so engaged, why should society by financing him in idleness, assist him in his efforts to wrong that same society? Or why, if he is not so engaged, should he hesitate so to assert? If he wishes to enjoy the benefits which a generous government provides, he should be willing to comply with a very simple condition.

Unlike the Cummings case, where great numbers of the persons living in Missouri would be forever barred from following their professions, and otherwise enjoying their privileges and rights as citizens because of previous activities, in the instant case, it is only the present status of the individual which is involved.

He may have formerly advocated the overthrow of the government by force and he may have belonged to organizations, working to that end, but if he now withdraws or has withdrawn from such membership and ceases such advocacy, he may fully participate in the Unemployment Compensation Fund, and the only proof of his eligibility which is required is his sworn statement to that effect.

The statute under consideration is not penal in its nature. It is not intended as a means to punish anyone for past conduct or affiliations, as was the case involving the Missouri constitution. It is simply intended that persons disloyal to our government may not participate in its bounty. It is calculated to avoid the danger of having the hand that offers food, bitten by the recipient thereof.

Neither is the statute one which attempts to govern the thinking of its citizens, or to control the politics, nationalism or religion of any individual. It attempts to insure that the unworthy shall not profit at the expense of the government they seek to destroy.

Plaintiff cites the case of Imbrie v. Marsh, 68 Atl. (2nd) 762, where a so-called loyalty oath prescribed by the Legislature

of New Jersey as being requisite for candidates for certain offices to assume before being eligible was attacked as unconstitutional. The following is that oath:

"That I do not believe in, advocate or advise the use of force, or violence, or other unlawful or unconstitutional means to overthrow or make any change in the Government established in the United States or in this state; and that I am not a member of or affiliated with any organization, association, party, group or combination of persons, which approves, advocates, advises or practices the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in either of the Governments so established, and that I am not bound by any allegiance to any foreign prince, potentate, state or sovereignty whatever."

This requirement was held invalid, by the Superior Court of New Jersey, because it added to the oath prescribed by the Constitution of New Jersey, for those inducted into certain offices. In its opinion the Court said:

"By prescribing an oath intended to secure fidelity to our constitution, which represents our basic democratic institutions, and also the faithful discharge of official duties, the framers of our constitution denied to the legislature authority to devise any other oath. The constitution sets out the exact words of the oath to be taken by senators and assemblymen. The legislators are not permitted to frame their own oaths; here nothing is left to their discretion. The legislature cannot authorize the omission of the oath or any part of it, or the addition of other clauses or of another oath."

The difference between the facts in that case and those under consideration are readily apparent, and the Court's decision is not helpful or persuasive here.

There was only under consideration the oath of office to be taken by persons elected thereto, and the Court said:

"An oath of office is somewhat akin to the bond that many public officers must give; it may honestly be subscribed by anyone regardless of his religious or other political beliefs, or whether he is a citizen or an alien; it is a promise and assurance of future official conduct; it is not a device for making some persons ineligible for office."

In other words to swear to support the Constitution and to faithfully perform the duties of a particular office covers the whole field of loyalty, and nothing more is needed, and nothing more permitted in view of the New Jersey Constitution. One who in good conscience subscribes to such an oath would be unable to work to the detriment of his office and the public without violating that oath and subjecting himself to a removal from office for malfeasance, misfeasance and nonfeasance.

Counsel also cite the cases of Thompson v. Board of Regents of the State of New York and Charles Q. Hommedieu v. Board of Regents of the University of the State of New York, both decided by the trial court. This Court has been unable to secure those decisions, so cannot determine whether the questions were similar or not, but if they are, they are not controlling on this Court, nor even persuasive if they purport to hold that a sovereignty may not impose reasonable conditions as precedent to the enjoyment of a gratuity or a privilege.

There has been filed in this case a brief on behalf of American Civil Liberties Union, as amicus curiae, in which the invalidity of the statutory provisions under consideration is urged and strong reliance is had upon the case of Board of Education v. Barnette, 319 U. S. 624, among numerous cases cited, all of which, in the opinion of this Court, are distinguishable, and only the Barnette case will be discussed.

In that case there was under consideration a statute of West Virginia, requiring pupils in public schools to give a prescribed salute to the American Flag and at the same time to pledge an allegiance thereto.

The Court held this statute to be in violation of the Constitution in that it attempts by compulsion to control national unity and political beliefs. The statute under consideration makes no such attempt. It is not designed to accomplish that end, but solely to determine whether enemies of our government shall be supported by that same government.

In the Barnette case Justice Frankfurter wrote a strong and thought-provoking dissenting opinion, and among other things he said:

"Conscientious scruples, all would admit, cannot stand against every legislative compulsion to do positive acts in conflict with such scruples. We have been told that such compulsions override religious scruples only as to major

concerns of the state. But the determination of what is major and what is minor itself raises questions of policy. For the way in which men equally guided by reason appraise importance goes to the very heart of policy. Judges should be very diffident in setting their judgment, against that of a state in determining what is and what is not a major concern, what means are appropriate to proper ends, and what is the total social cost in striking the balance of imponderables.

\*   \*   \*   \*

The constitutional protection of religious freedom terminated disabilities, it did not create new privileges. It gave religious equality, not civil immunity. Its essence is freedom from conformity to religious dogma, not freedom from conformity to law because of religious dogma. Religious loyalties may be exercised without hindrance from the state, not the state may not exercise that which except by leave of religious loyalties is within the domain of temporal power. Otherwise each individual could set up his own censor against obedience to laws conscientiously deemed for the public good by those whose business it is to make laws.

\*   \*   \*   \*

An act compelling profession of allegiance to a religion, no matter how subtly or tenuously promoted, is bad. But an act promoting good citizenship and national allegiance is within the domain of governmental authority and is therefore to be judged by the same considerations of power and of constitutionality as those involved in the many claims of immunity from civil obedience because of religious scruples.

\*   \*   \*

The subject of dissidents to the general requirement of saluting the flag, as a measure conducive to the training of children in good citizenship, is very far from being the first instance of exacting obedience to general laws that have offended deep religious scruples.

\*   \*   \*   \*

Law is concerned with external behavior and not with the inner life of man. It rests in large measure upon compulsion. Socrates lives in history partly because he gave his life for the conviction that duty of obedience to secular law does not presuppose consent to its enactment or belief in its virtue. The consent upon which free government rests is the consent that comes from sharing in the process of making and unmaking laws. The state is not shut out from a domain because the individual conscience may deny the state's claim. The individual conscience may profess what

faith it chooses. It may affirm and promote that faith—in the language of the Constitution, it may 'exercise' it freely—but it cannot thereby restrict community action through political organs in matters of Community concern, so long as the action is not asserted in a discriminatory way either openly or by stealth. One may have the right to practice one's religion and at the same time owe the duty of formal obedience to laws that run counter to one's beliefs. Compelling belief implies denial of opportunity to combat it and to assert dissident views. Such compulsion is one thing. Quite another matter is submission to conformity of action while denying its wisdom or virtue and with ample opportunity for seeking its change or abrogation."

*      *      *      *

"The right of West Virginia to utilize the flag salute as part of its educational provess is denied because, so it is argued, it cannot be justified as a means of meeting a 'clear and present danger' to national unity. In passing it deserves to be noted that the four cases which unanimously sustained the power of states to utilize such an educational measure arose and were all decided before the present World War. But to measure the state's power to make such regulations as are here resisted by the imminence of national danger is wholly to misconceive the origin and purpose of the concept of 'clear and present danger.' To apply such a test is for the Court to assume, however unwittingly, a legislative responsibility that does not belong to it. To talk about 'clear and present danger' as the touchstone of allowable educational policy by the states whenever school curricula may impinge upon the boundaries of individual conscience, is to take a felicitous phrase out of the context of the particular situation where it arose and for which it was adapted, Mr. Justice Holmes used the phrase 'clear and present danger' in a case involving mere speech as a means by which alone to accomplish sedition in time of war. By that phrase he meant merely to indicate that, in view of the protection given to utterance by the First Amendment, in order that mere utterance may not be proscribed, 'the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.' Schenck v. United States, 249 U. S. 47, 52. The 'substantive evils' about which he was speaking were in-

ducement of insubordination in the military and naval forces of the United States and obstruction of enlistment while the country was at war. He was not enunciating a formal rule that there can be no restriction upon speech and, still less, no compulsion where conscience balks, unless imminent danger would thereby be wrought 'to our institutions or our government.' "

In the majority opinion the Court said:

"It is now a commonplace that censorship or suppression of expression of opinion is tolerated by our Constitution only when the expression presents a clear and present danger of action of a kind the state is empowered to prevent and punish. It would seem that involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence. But here the power of compulsion is invoked without any allegation that remaining passive during a flag salute ritual creates a clear and present danger that would justify an effort even to muffle expression * * *"

This makes the distinction between that case and the instant one clear.

Objections to the compulsory salute were raised by certain religious groups, parent and teachers associations, Scouts, The Red Cross and The Federation of Womens Clubs. It is difficult to connect a failure to salute the flag with any imminent danger to our government. There is a real and vital danger to that government, presented, in the form of organizations the avowed aim of which is to destroy our form of government, and where the Legislature has recognized that danger, courts should be most reluctant to interfere, unless there has been a clear invasion of Constitutional rights.

With the present threats to democratic principles, and the freedoms provided by our Constitution, it is high time that in our zeal to protect the rights of individuals, we give some attention to the **general welfare**, which was also included in the purposes which were announced as the reasons for the adoption of that constitution. It is high time that we take protective steps to insure, that the philosophy of the Declaration of Independence to the effect that governments are instituted among men to secure the sacred rights of life, liberty and the pursuit of happiness shall be perpetuated, and that

our Government, which was so instituted and which has been continued for such purposes shall not **"perish from the earth."**

As Lincoln said in his first inaugural address, this Government is "the last best hope of earth." It is even truer today than when he uttered those prophetic words.

Our Legislature has sensed a real danger to our democracy in the persons of those, some citizens, many aliens, as well as established organizations, who seek by force to destroy this "last best hope of earth," this citadel of political and religious liberty and when that Legislature has seen fit to impose as a condition for the receipt of government largess that the recipient thereof shall satisfy the giver that he is not an avowed enemy of the donor, courts should not interfere.

The time to thwart the enemies within our gates is now and not at some future time when their power has become so strong as to amount to a still greater menace. Let us not be guilty of awaiting the theft of the horse before we lock the stable door.

Let those who mayhap sincerely espouse the cause of disloyalty in whatever guise, search their consciences and determine whether or not in their desires to assist those who seek to undermine and destroy the foundations of our institutions they have not overlooked the greater good for the greater number, and lost sight of what is best and most expedient for the "general welfare."

Counsel for defendant have raised the question as to plaintiff's right to prosecute this action, as it does not appear that he is either an employer contributing to the Unemployment Fund, nor a worker entitled to participate therein. He seems to appear only as a taxpayer to prevent illegal expenditures of public money.

It does not appear that the inclusion of the affidavit provided for, in the application for Unemployment Compensation, adds anything to the cost of the application, without this affidavit, or if so, how much.

If there is any added cost it must be rather inconsiderable, so that a suspicion is aroused in the mind of the Court that the action is not brought for purposes of public economy. However, the Court has deemed it well to resolve that question in plaintiff's favor and to decide the case on its merits.

There is nothing in the record or the briefs which in any way tends to show that the enforcement of the provision under consideration will lead to any great confusion, contention or litigation or will undermine the purpose of the Unemployment Compensation law as counsel contend.

The Court is fully of the opinion, after a careful consideration of all the submitted authorities and others not cited that the statute is a valid enactment, and provides a reasonable condition to be complied with by those who seek the benefits of the Unemployment Compensation Law. Those directly affected seem to have voiced no disapproval. If they are satisfied it would seem that there is no need for interference by those who set themselves up as guardians of liberty and monitors of the actions of our law makers and administrators.

It is therefore ordered that plaintiff's action be dismissed at plaintiff's costs.