[L. A. No. 23847. In Bank. Apr. 24, 1957.]

FIRST UNITARIAN CHURCH OF LOS ANGELES (a Corporation), Appellant, v. COUNTY OF LOS ANGELES et al., Respondents.

William R. Murrish, George T. Altman and Robert L. Brock for Appellant.

Charles E. Beardsley and Stanley A. Weigel as Amici Curiae on behalf of Appellant.

Harold W. Kennedy, County Counsel, Gordon Boller, Assistant County Counsel, and Alfred C. DeFlon, Deputy County Counsel for Respondents.

SHENK, J.—This is an appeal from a judgment for the defendants following an order sustaining a general demurrer to the complaint without leave to amend.

The action was brought to recover taxes paid under protest and for declaratory relief. The plaintiff is a duly organized nonprofit religious organization with its principal office in the city of Los Angeles. It is the owner of real property devoted exclusively to religious purposes and located within the jurisdiction of, and subject to property taxation by, the county and city of Los Angeles. It presented to the assessor of Los Angeles County an application for the exemption of its property, particularly described, for the fiscal year 1954-1955. The application was denied by the assessor on the ground that the plaintiff had not qualified for an exemption because it had failed and refused to include in the application for exemption the nonsubversive declarations required by section 32 of the Revenue and Taxation Code. The application was otherwise complete. Thereafter the real property of the plaintiff was assessed as property not exempt, and within the time prescribed by law the plaintiff paid the tax under protest and brought this action for the recovery of the sum so paid. The assessor refused to allow the exemption because of the provisions of section 19 of article XX of the Constitution[1] and section 32 of the Revenue and Taxation Code.[2]

Section 19 of article XX was adopted at the general election on November 4, 1952, and was placed as a new section in that article under the heading ''Miscellaneous Subjects.'' The section reads:

''Section 19. Notwithstanding any other provision of this Constitution, no person or organization which advocates the overthrow of the Government of the United States or the

---

[1]Hereinafter referred to as section 19 of article XX.

[2]This and all other code sections hereinafter referred to will be to sections of the Revenue and Taxation Code unless otherwise indicated.

State by force or violence or other unlawful means or who advocates the support of a foreign government against the United States in the event of hostilities shall:

"(a) Hold any office or employment under this State, including but not limited to the University of California, or with any county, city or county, city, district, political subdivision, authority, board, bureau, commission or other public agency of this State; or

"(b) Receive any exemption from any tax imposed by this State or any county, city or county, city, district, political subdivision, authority, board, bureau, commission or other public agency of this state.

"The Legislature shall enact such laws as may be necessary to enforce the provisions of this section." (Stats. 1953.)

Following the amendment to the Constitution section 32 was added to the Revenue and Taxation Code in 1953. It is as follows:

"Any statement, return, or other document in which is claimed any exemption, other than the householder's exemption, from any property tax imposed by this State or any county, city or county, city, district, political subdivision, authority, board, bureau, commission or other public agency of this State shall contain a declaration that the person or organization making the statement, return, or other document does not advocate the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means nor advocate the support of a foreign government against the United States in event of hostilities. If any such statement, return, or other document does not contain such a declaration, the person or organization making such statement, return, or other document shall not receive any exemption from the tax to which the statement, return, or other document pertains. Any person or organization who makes such declaration knowing it to be false is guilty of a felony. This section shall be construed so as to effectuate the purpose of Section 19 of Article XX of the Constitution." (Stats. 1953, p. 3114.)

The plaintiff contends that both the constitutional provision and the code section are invalid. It is argued that the imposition and collection of taxes sought to be recovered and the denial of the church property tax exemption provided for in section 1½ of article XIII of the Constitution, as applied to the plaintiff church and all other churches similarly situated, was and is in violation of the provisions of the

426

state and federal Constitutions which require reasonable and proper classifications for purposes of taxation and provide for freedom of religion, freedom of speech and the protection of other rights specified in the protest a copy of which is attached to and made a part of the complaint. The provisions of the protest will be referred to later on in this opinion.

It is noted that section 19 of article XX does not specifically mention churches or any other organizations or individuals which are subject to its provisions. Its terms are general and apply to all owners of property as to which exemption from taxation might be claimed.

■ It is fundamental that the payment of taxes has been and is a uniform if not a universal demand of government, and that there is an obligation on the part of the owner of property to pay a tax legally assessed. ■ An exemption from taxation is the exception and the unusual. To provide for it under the laws of this state requires constitutional or constitutionally authorized statutory authority. ■ It is a bounty or gratuity on the part of the sovereign and when once granted may be withdrawn. It may be granted with or without conditions but where reasonable conditions are imposed they must be complied with.

■ A church organization is in no different position initially than any other owner of property with reference to its obligations to assist in the support of government by the payment of taxes. Church organizations, however, throughout the history of the state, have been made special beneficiaries by way of exemptions. A brief reference to the constitutional and statutory background relating to this and other exemptions in this state will be made.

We find in the Constitution of 1849 the following provisions: "Taxation shall be equal and uniform throughout the state. All property in this state shall be taxed in proportion to its value, to be ascertained as directed by law. . . ." (Laws of California, 1850-1853, p. 57, art. XI, § 13.) No provision for exemption from taxation is found in that Constitution. In 1853 the Legislature passed an act entitled "AN ACT *to provide Revenue for the Support of the Government of this State.*" (Laws of California, 1850-1853, p. 669.) In section 1 of article I it was provided that all land in the state owned or claimed by any person or corporation shall be listed for taxation. In section 2 of the same article it was provided that "The following property shall not be listed for taxation." Then follow several paragraphs where numerous classifica-

tions of property are named, such as publicly owned property, town halls, public squares, colleges, schoolhouses, public hospitals, asylums, poorhouses, cemeteries and graveyards. In paragraph 5 it was provided that the following also shall not be listed for taxation: "Churches, chapels, and other buildings for religious worship, with their furniture and equipments, and the lots of ground appurtenant thereto and used therewith, so long as the same shall be used for that purpose only." (Laws of California, 1850-1853, p. 671.)

This statutory method of providing for exemptions continued until the adoption of the Constitution of 1879. Section 1 of article XIII of the new Constitution required constitutional authority for exemptions. It was there provided that "All property in this State except as otherwise in this Constitution provided, . . . shall be taxed in proportion to its value, to be ascertained as provided by law. . . ." In subsequent sections of the same article the exemption of numerous classes of particularly described property is provided for. Section 1½ of article XIII provides for the church exemption as follows: "All buildings, and so much of the real property on which they are situated as may be required for the convenient use and occupation of said buildings, when the same are used solely and exclusively for religious worship . . . shall be free from taxation. . . ."

In 1944 section 1c was added to article XIII which provides that "In addition to such exemptions as are now provided in this Constitution, the Legislature may exempt from taxation all or any portion of property used exclusively for religious, hospital or charitable purposes . . ." This provision did not have the effect of changing existing laws with reference to the exemption of church property except to authorize the Legislature to extend the exemption of that property as provided for in section 1½ of article XIII to its personal property. Whether that section is self-executing is of no concern for in 1903 the Legislature added section 3611 to the Political Code, repeating the constitutional language which exempted church real property and providing among other things that "any person claiming property to be exempt from taxation under this section shall make a return thereof to the assessor annually, the same as property is listed for taxation, and shall accompany the same by an affidavit showing that the building is used solely and exclusively for religious worship, and that the described portion of the real property claimed as exempt is required for the convenient

use and occupation of such building. . . ." (Stats. 1903, p. 21.) The reference in that section to property which "is listed for taxation" was in contemplation of section 8, article XIII of the Constitution, which has provided since 1879 that "The Legislature shall by law require each taxpayer in this State to make and deliver to the county assessor, annually, a statement, under oath, setting forth specifically all the real and personal property owned by such taxpayer, or in his possession, or under his control, at 12 o'clock meridian, on the first Monday of March."

Section 3611 of the Political Code was carried into the Revenue and Taxation Code in 1939 as section 254, which provides that any "person claiming the church . . . exemption shall make a return of the property to the assessor annually, the same as property is listed for taxation, and shall accompany it by an affidavit, giving any information required by the" State Board of Equalization. The form prescribed by the State Board of Equalization includes the nonsubversive portion of the affidavit, which the plaintiff has refused to include in its return.

■ No meritorious argument has been or can be advanced to the effect that section 19 of article XX is not a valid enactment under state law or that it is inapplicable to the church property exemption provided for in section 1½ of article XIII. Section 19 of article XX was adopted in accordance with the procedures required by the Constitution for an amendment to that document by vote of the electors of this state. Its provisions are plain and unambiguous and require no interpretation in the matter of their prohibitions. In direct terms it provides that no person or organization included in the proscribed class shall receive an exemption from any tax imposed by the state or any taxing agency of the state. It applies to all tax exemption claimants. Its prohibitions are declared by its own terms and are mandatory and prohibitory. (Const., art. I, § 22.) By its enactment the people of the state declared the public policy of withholding from the owners of property in this state who engage in the prohibited activities the benefits of tax exemption. The denounced activities are criminal offenses under state law (Stats. 1919, p. 281), and the act of Congress known as the Smith Act (54 Stat. 670) makes it unlawful to advocate the overthrow of the government by force and violence.

■ It may properly be said that the primary purpose of the people of the state in the enactment of section 19 of

article XX was to provide for the protection of the revenues of the state from impairment by those who would seek to destroy it by unlawful means. It contains no exceptions. It applies to churches when it provides that ''Notwithstanding any other provisions of this Constitution'' its prohibitions shall apply to all tax exemption claimants, and declares in effect that the tax revenues of the state shall not be depleted by those who would seek to destroy it in violation of the criminal laws of the state and the nation. It is clear that section 19 of article XX is a valid enactment under the Constitution of the state. That it was properly incorporated in the Constitution as a matter of state policy may not be questioned.

It is then to consider whether section 32 is a valid implementation of section 19 of article XX. Section 32 declares that ''This section shall be construed so as to effectuate the purpose of Section 19 of article XX of the Constitution.'' █ Notwithstanding the fact that a particular provision may be self-executing, legislation enacted in aid thereof is not invalid. (*Chesney* v. *Byram*, 15 Cal.2d 460, 463 [101 P.2d 1106].) The code section declares within itself its purpose but that purpose is obvious without the declaration.

The plaintiff contends that section 32 is void for several reasons. First, because of the exception from its requirements of householders who are entitled to an exemption of $100 of assessed value of their personal property as provided for in section 10½ of article XIII of the Constitution. It is contended that this exception renders the section lacking in uniformity and thus provides for an unlawful classification of taxable property under the law. Secondly, that it violates the federal constitutional guarantees of separation of church and state and freedom of speech. The first contention will be considered in advance of the others for the reason that it involves the application of the Constitution and laws of the state relating to taxation.

█ If it be assumed for the moment that section 32 is invalid for any of the reasons stated, still the plaintiff, under the general provisions of state law, is not relieved from its obligation otherwise to disclose the facts required by section 32. In this connection the powers and duties of the assessor and the obligations of the plaintiff as the owner of real and personal property must be considered in the light of state law. Those powers, duties and obligations are set forth generally in the Revenue and Taxation Code.

 It is the duty of the assessor to see that all property within his jurisdiction is legally assessed and that exemptions are not improperly allowed. He is liable on his bond "for all taxes on property which is unassessed through his wilful failure or neglect." (§ 1361.) By section 441 it is provided in accordance with section 8 of article XIII of the Constitution that "Every person shall file a written property statement, under oath, with the assessor between noon on the first Monday in March and 5 p. m. on the last Monday in May, annually, and within such time as the assessor may appoint. At any time, as required by the assessor for assessment purposes, every person shall furnish information or records for examination." For use by the assessor and the property owner the State Board of Equalization is required to prepare the forms of blanks for the property statement. (§ 452.) The assessor may subpoena and examine any person in relation to any statement furnished by him. (§ 454.) Any person who wilfully states to the assessor anything which he knows to be false, in any oral or written statement, even not under oath, but required or authorized to be made and relating to an assessment, is guilty of a misdemeanor. (§ 461.) Section 462 provides that every person is guilty of a misdemeanor who, after proper demand by the assessor, refuses to give the assessor a list of his taxable property or "Refuses to swear to the list." By section 463 it is provided, among other things, that every person shall forfeit $100 to the people of the state, to be recovered by action brought in their name by the assessor, for each refusal to furnish the property statement or to fail to appear and testify when requested to do so by the assessor.

It thus appears that under the tax laws of the state wholly apart from section 32 it is the duty of the assessor to ascertain the facts with reference to the taxability or exemption from taxation of property within his jurisdiction. And it is also the duty of the property owner to cooperate with the assessor and assist him in the ascertainment of these facts by declarations under oath.

With particular reference to the many and various tax exemptions, the Revenue and Taxation Code provides for the ascertainment of the facts as a prerequisite for exemptions. Those facts in many instances must be made known to the assessor by the affidavit of the tax exemption claimant. They include, among others, veterans exemptions, church exemptions, welfare exemptions, college exemptions and orphanage

exemptions. In the case of the church exemption the affidavit shall give "any information required" to carry the exemption into effect. (§ 254.) It is significant to note that nowhere in the law of the state is there a requirement for the property owner to make a showing for tax exemptions in the case of householders, cemeteries, game refuges and a few others. It thus appears that the Legislature in addition to the exception of householders from the requirements of section 32 has made no requirement otherwise for any showing on their part of their right to the exemption, either by affidavit or otherwise. If the exclusion of householders from the requirement of section 32 renders that section void as discriminatory or lacking in uniformity it would seem to follow that the entire Revenue and Taxation Code with reference to procedures to qualify for exemptions would be void for the same reason. But obviously no such claim is made.

As stated it is the duty of the assessor to see that exemptions are not allowed contrary to law and this of course includes those which are contrary to the prohibitions provided for in section 19 of article XX. With the aid of section 32 his task is facilitated by the means therein supplied. Without that aid he is nevertheless required to ascertain the facts with reference to tax exemption claimants. Those facts may be disclosed in several different ways. In the instances in which he is without the assistance or cooperation of the tax exemption claimant and he is relegated to his own devices in discovering the facts he may do so by the examination under oath of the exemption claimant. (§ 454.) ■■■ If he is satisfied from his investigations that the exemption should not be allowed he may assess the property as not exempt and if contested compel a determination of the facts in a suit to recover the tax paid under protest. In such a case it would be necessary for the claimant to allege and prove facts with reference to the nature, extent and character of the property which would justify the exemption and compliance with all valid regulations in the presentation and prosecution of the claim. ■■■ In any event it is the duty of the assessor to ascertain the facts from any legal source available. In performing this task he is engaged in the assembly of facts which are to serve as a guide in arriving at his conclusion whether an exemption should or should not be allowed. That conclusion is in no wise a final determination that the claimant belongs to a class proscribed by section 19 of article XX or is guilty of any activity there denounced. ■■■ The pre-

sumption of innocence available to all in criminal prosecutions does not in a case such as this relieve or prevent the assessor from making the investigation enjoined upon him by law to see that exemptions are not improperly allowed. His administrative determination is not binding on the tax exemption claimant but it is sufficient to authorize him to tax the property as nonexempt and to place the burden on the claimant to test the validity of his administrative determination in an action at law. For the obvious purpose, among others, of avoiding litigation, the Legislature, throughout the years has sought to relieve the assessor of the burden, on his own initiative and at the public expense, of ascertaining the facts with reference to tax exemption claimants. In addition to the means heretofore and otherwise provided by law the Legislature, with special reference to the implementation of section 19 of article XX, has enacted section 32. That section provides a direct, timesaving and relatively inexpensive method of ascertaining the facts. The Legislature could take these factors into consideration. It could also take into account the fact that the segment of householders in this state is so overwhelmingly large as compared with others chosen for exemptions that the cost of processing them would justify their separate classification. Where any state of facts can be reasonably conceived which would sustain legislative classification the existence of those facts will be presumed. (*Lelande* v. *Lowery*, 26 Cal.2d 224, 232-233 [157 P.2d 639, 175 A.L.R. 1109].) Furthermore, aside from the power of the Legislature to classify for the purpose of general legislation (see *Reclamation District* v. *Riley*, 192 Cal. 147, 156 [218 P. 762]; 24 Cal.Jur. 432) there is another and more conclusive reason why it may classify the personal property of householders. Section 14 of article XIII of the Constitution was amended in 1933 to provide that the Legislature "shall have the power to provide for the assessment, levy and collection of taxes upon all forms of tangible personal property . . . may classify any and all kinds of personal property for the purposes of assessment and taxation in a manner and at a rate or rates in proportion to value different from any other property in this State subject to taxation and may exempt entirely from taxation any or all forms, types or classes of personal property." Of this constitutional provision this court said in *Roehm* v. *County of Orange*, 32 Cal.2d 280 at pages 283-284 [196 P.2d 550] : "Article XIII of the California Constitution as first adopted provided for a uniform property

tax upon real and personal property alike. This requirement of uniform taxation of real and personal property, however, has been abandoned by subsequent amendments. Under these amendments the Legislature may classify personal property for purposes of taxation or exempt all personal property or any form, type, or class thereof,'' and on page 285 the court declared that this authorization to the Legislature to classify tangible personal property is ''all inclusive'' and covers ''all forms'' of tangible personal property. The personal property of the householders falls within the kind of personal property which the Legislature was constitutionally authorized to classify for purposes of taxation.

There is therefore no merit in the plaintiff's contention that the exception of householders from the requirements of section 32 renders that section invalid. ▮ There is likewise no merit in the contention that the section is invalid because of the failure of the Legislature to include within its requirements those who are entitled to exemptions under income tax laws and numerous other tax laws wherein certain exemptions are taken into consideration in arriving at the amount of the tax to be paid. Those taxes are in categories which are subject to different treatment by separate classification. ▮ The Legislature is at liberty to select one phase of a problem for appropriate action without the necessity of including all others which might be affected in the same field of legislation. (*Williamson* v. *Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489 [75 S.Ct. 461, 99 L.Ed. 563], and cases there cited.) ▮ Section 32 applies to all exemption claimants to which it relates and supplies appropriate means for carrying out the purposes of section 19 of article XX. The foregoing application of tax laws of the state is peculiarly a matter of state concern. (*Chanler* v. *Kelsey,* 205 U.S. 466 [27 S.Ct. 550, 51 L.Ed. 882] ; *Orr* v. *Gilman,* 183 U.S. 278 [22 S.Ct. 213, 46 L.Ed. 196] ; 24 Cal.Jur. 434-435.)

We turn now to the question of the validity of the constitutional amendment and implementing legislation under guarantees of the federal Constitution. We approach this phase of the case in the light of the fact that section 19 of article XX prescribes no penal sanctions and in a governmental sense may be deemed merely a declaration of state policy with reference to its own tax structure. However, the plaintiff has taken the position that this constitutional provision is in reality an unlawful limitation on its constitutional rights

which are protected by the federal Constitution. This question is extensively argued on behalf of the plaintiff.

It is claimed that section 19 of article XX imposes an unconstitutional condition on the right to a tax exemption in that it violates the First and Fourteenth Amendments of the federal Constitution which prohibit, among other things, the making of any law "respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." (See *McCollum* v. *Board of Education,* 333 U.S. 203, 210 [68 S.Ct. 461, 92 L.Ed. 649, 2 A.L.R.2d 1338]; *Cantwell* v. *Connecticut,* 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352].)

■ Without the slightest doubt the First Amendment reflects the philosophy that church and state should be kept separate. (*Zorach* v. *Clauson* (1952), 343 U.S. 306, 312 [72 S.Ct. 679, 96 L.Ed. 954]; *Everson* v. *Board of Education,* 330 U.S. 1, 59 [67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392].) However, the First "Amendment embraces two concepts,— freedom to believe and freedom to act. The first is an absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. . . ." (*Cantwell* v. *Connecticut, supra,* 310 U.S. 296, 303-304; see also *United States* v. *Ballard,* 322 U.S. 78, 86 [64 S.Ct. 882, 88 L.Ed. 1148].) ■ In the present case it is apparent that the limitation imposed by section 19 of article XX as a condition of exemption from taxation, is not a limitation on mere belief but is a limitation on action—the advocacy of certain proscribed conduct. What one may merely believe is not prohibited. It is only advocates of the subversive doctrines who are affected. Advocacy constitutes action and the instigation of action, not mere belief or opinion. (See *Gitlow* v. *New York,* 268 U.S. 652 [45 S.Ct. 625, 69 L.Ed. 1138]; *Leubuscher* v. *Commissioner of Int. Rev.,* 54 F.2d 998, 999.)

We are concerned, then, not with the freedom to believe but with the limited freedom to act. ■ The exercise of religious activity has long been recognized as subject to some limitation if that exercise is deemed detrimental to society. In *Reynolds* v. *United States,* 98 U.S. 145 [25 L.Ed. 244], the plaintiff was a church member and a conscientious practitioner of its established doctrine which encouraged polygamy. The Supreme Court in holding that such religious activity was subject to legislative limitations, stated at page 167 that to permit exceptions based on religious doctrine "would be to make the professed doctrines of religious belief superior

to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." (See also *Cleveland* v. *United States*, 329 U.S. 14 [67 S.Ct. 13, 91 L.Ed. 12]; *Prince* v. *Massachusetts*, 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645].) There are decisions wherein statutory provisions having some effect on religious activity have been upheld on the ground that their effect was only incidental. In *Zorach* v. *Clauson* (1952), *supra*, 343 U.S. 306, the Supreme Court sustained the New York "released time" statutory provisions whereby public schools were permitted to release children for religious purposes during a part of the normal school day. Contentions were made to the effect that those provisions prohibited the "free exercise" of religion or were "respecting an establishment of religion" within the meaning of the First Amendment. The court concluded at pages 312-313 that the First Amendment "studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other —hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. . . . We would have to press the concept of separation of Church and State to those extremes to condemn the present law on constitutional grounds."

In the present case there is nothing in the new enactments, either constitutional or statutory, which interferes with the free exercise of religion. The plaintiff is affected not because it is a religious organization but because it is a taxpayer favored in the law by an exemption for which it has refused to qualify. The plaintiff has failed to point out what tenet or doctrine of its faith is infringed upon by compelling it to qualify for the exemption. Those tenets and doctrines are set forth in a document attached to the protest of the payment of its taxes and is made a part of the com-

plaint. It announces to the world the plaintiff's high principles and purposes. The prohibited activity cannot, with any reason whatsoever, be consistent with or be tolerated by the religious doctrines there published and subscribed to by the plaintiff. As against a claim that such advocacy might be included within religious teaching, the Supreme Court has disposed of the contention. In *Murdock* v. *Pennsylvania,* 319 U.S. 105 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81], the court stated at page 109 that "we do not intimate or suggest . . . that any conduct can be made a religious rite and by the zeal of the practitioners swept into the First Amendment. *Reynolds* v. *United States,* 98 U.S. 145, 161-167 [25 L.Ed. 244], and *Davis* v. *Beason,* 133 U.S. 333 [10 S.Ct. 299, 33 L.Ed. 637] denied any such claim to the practice of polygamy and bigamy. Other claims may well arise which deserve the same fate." In *Davis* v. *Beason,* cited in the Murdock case, the court said of the advocacy of plural marriages: "To call their advocacy a tenet of religion is to offend the common sense of mankind. . . . The term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of his obedience to His will. . . . It is assumed by counsel of the petitioner, that because no mode of worship can be established or religious tenets enforced in this country, therefore any form of worship may be followed and any tenets, however destructive of society, may be held and advocated, if asserted to be a part of the religious doctrines of those advocating and practising them. But nothing is further from the truth. . . . It does not follow that everything which may be so called can be tolerated. Crime is not the less odious because sanctioned by what any particular sect may designate as religion." As above noted the advocacy of the conduct prohibited has been made criminal by Congress (Smith Act, 54 Stat., part I, p. 670 [1940]), and through numerous statutory provisions by state legislatures it is well established that such advocacy is against local public policy. (See Levering Act, Stats. 1951 [3d Ex. Sess. 1950, ch. 7], p. 15.) In upholding the validity of the Levering Act this court in *Pockman* v. *Leonard,* 39 Cal.2d 676 [249 P.2d 267], stated that the oath required there and similar in effect to the present one, was "obviously not a test of religious opinion."

It is further claimed by the plaintiff that section 32 imposes unconstitutional limitations upon the exercise of

religion. As possibly affecting religion, section 32, in addition to the limitations imposed by the Constitution, requires the making of an oath. Since this oath is "obviously not a test of religious opinion" the plaintiff is not excused from making it any more than any other taxpayer. It appears that an oath was subscribed on behalf of the plaintiff by one of its officers when it filed its affidavit with the claim for exemption and its complaint in this action was also verified on its behalf. If the making of the oath is objectionable to the plaintiff it must be for reasons relating to the content of the particular oath and not merely because it is an oath. This contention, therefore, may not be sustained.

It is also claimed that section 19 of article XX is a restriction on freedom of speech. The phrase "freedom of speech" is helpful in bringing to mind the concept which it means to convey, but as is often the case such a descriptive phrase assumes a literal meaning which causes difficulty and confusion in the development of the law surrounding it. Justice Holmes aptly stated that it "is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis." (See *Hyde* v. *United States*, 225 U.S. 347, 390 [32 S.Ct. 793, 56 L.Ed. 1114, 1135]; see also Corwin, *Bowing Out "Clear and Present Danger,"* 27 Notre Dame Lawyer 325.)

Despite the fact that the First Amendment is cast in terms of the absolute it is not to be applied literally. There never has been an absolute right of free speech or an unqualified liberty to speak. "Speech" in the broad sense embodies all means of expression and communication. It is the primary vehicle by which individuals and organizations converse and transmit ideas, information and knowledge, and is deserving of the highest degree of protection and preservation. But there are other important interests of society which, at times, may conflict with the interest of individuals or groups in the exercise of this asserted freedom. In such circumstances the courts must declare when the individual or group does or does not have a right to speak freely, depending on a balance of the individual's right to speak out as against the harm or injury society may suffer as a result of such speech. The courts have been called upon to engage in this weighing process in many instances. Illustrative are those which protect society from a breach of the peace (*Chaplinsky* v. *New Hampshire*, 315 U.S. 568 [62 S.Ct. 766, 86 L.Ed. 1031]), "loud and raucous" noises caused by

438

sound trucks (*Kovacs* v. *Cooper*, 336 U.S. 77 [69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608]), interruption of the free flow of commerce (*American Communications Assn.* v. *Douds*, 339 U.S. 382 [70 S.Ct. 674, 94 L.Ed. 925]) and the like.

The standard by which the various interests have been balanced has, until recently, been the so-called ''clear and present danger'' test. It was heretofore declared that the right to free speech could be infringed upon only in situations where it appeared that the ''words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils'' sought to be repressed. (*Schenck* v. *United States*, 249 U.S. 47, 52 [39 S.Ct. 247, 63 L.Ed. 470].) However, in *Dennis* v. *United States*, 341 U.S. 494 [71 S.Ct. 857, 95 L.Ed. 1137], the Supreme Court, reviewing its earlier decisions in this field, reconsidered the test in the light of existing and recognized realities and in conclusion stated: ''Chief Judge Learned Hand, writing for the majority below, interpreted the phrase as follows: 'In each case [courts] must ask whether the gravity of the ''evil,'' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' 183 F.2d at 212. We adopt this statement of the rule. As articulated by Chief Judge Hand, it is as succinct and inclusive as any other we might devise at this time. It takes into consideration those factors which we deem relevant, and relates their significances. More we cannot expect from words.'' By that statement of the test the standard by which a weighing of interests is to be made is clearly indicated.

The interest of the state in protecting its revenue raising program from subversive exploitation has already been considered. There are additional interests with which the state is concerned and which it is attempting to promote by granting exemptions from taxation. Included is the interest of the state in maintaining the loyalty of its people and thus safeguarding against its violent overthrow by internal or external forces. This legitimate objective is sought to be accomplished by placing in a favored economic position, and thus to promote their well being and sphere of influence, those particular persons and groups of individuals who are capable of formulating policies relating to good morals and respect for the law. It has been said that when church properties are exempted from taxation ''it must be because, apart from religious considerations, churches are regarded as institutions

established to inculcate principles of sound morality, leading citizens to a more ready obedience to the laws." (*County of Santa Clara* v. *Southern Pac. R. Co.*, 18 F. 385, 400 [9 Sawy. 165]; 24 Cal.Jur. 105.) The same may be said of others enjoying tax exemptions, notably veterans (art. XIII, § 1¼; *Allied Architects Assn.* v. *Payne,* 192 Cal. 431 [221 P. 209, 30 A.L.R. 1029]; *Veterans' Welfare Board* v. *Riley,* 188 Cal. 607, 611 [206 P. 631]), colleges (art. XIII, § 1a) and charitable organizations (art. XIII, § 1c) which, together with church groups, occupy positions whereby they may exert a salutary influence on the moral well-being of the community. Encouragement to loyalty to our institutions and an incentive to defend one's country in the event of hostilities are doctrines which the state has plainly promulgated and intends to foster. It is the high purpose residing in its people that the state is attempting to encourage in its endeavor to protect itself against subversive infiltration. The propriety of that objective is recognized by the Supreme Court in the Dennis case (*Dennis* v. *United States, supra,* 341 U.S. 494) where it said at page 509: "Overthrow of the Government by force and violence is certainly a substantial enough interest for the Government to limit speech. Indeed, this is the ultimate value of any society, for if a society cannot protect its very structure from armed internal attack, it must follow that no subordinate value can be protected."

Obviously, a program of tax exemption designed to promote adherence to the principles of our government but constrained to include within its bounty persons or organizations actively advocating subversion and the support of enemies in time of hostilities, would be wholly without reason and result in its own defeat.

The test requires further that consideration be given not only to the "gravity of the 'evil'" sought to be repressed but that the evil be "discounted by its improbability." The Dennis case involved the validity of the Smith Act which prohibited and made criminal the advocacy of the activities denounced by the people of this state in its Constitution. In speaking of the imminence of the threat posed by the advocacy of subversive activities, the court at page 509 stated: "If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required. . . . Certainly an attempt to overthrow

the Government by force, even though doomed from the outset because of inadequate numbers or power of the revolutionists, is a sufficient evil for Congress to prevent." In that case the court upheld an instruction to the jury that if the defendants actively advocated governmental overthrow by force and violence as speedily as circumstances would permit, then as a "matter of law . . . there is sufficient danger of a substantive evil that the Congress has a right to prevent to justify the application of the statute under the First Amendment of the Constitution." In the present case the constitutional provision is concerned with those who advocate the same prohibited activity. It must be said that such advocacy from whatever source poses a threat to our government and that the gravity of the evil is not to be materially discounted by its improbability within the meaning of the test employed in the Dennis case.

Against the fundamental interest sought to be safeguarded by the state it is necessary to consider and balance the interest of those who assert that their right to speak has been unduly limited. From what has heretofore been said it is apparent that the limitation on speech is a conditional one, imposed only if a tax exemption is sought; that the prohibited advocacy is penal in nature, and that not one of the fundamental guarantees but only a privilege or bounty of the state is withheld if the exemption claimant prefers to engage in the prohibited criminal advocacy. It is obvious, therefore, that by no standard can the infringement upon freedom of speech imposed by section 19 of article XX be deemed a substantial one.

Apart from considerations involving the constitutional amendment the additional requirement of an oath imposed by section 32, of and by itself, gives no cause for the plaintiff to complain that it is improperly deprived of constitutional freedoms where compliance with the oath requirements otherwise may properly be imposed. (*Chesney* v. *Byram, supra,* 15 Cal.2d 460, 465-468.)

Statutory limitations on the free exercise of speech similar in nature to the present limitation have been imposed as valid conditions upon which some privilege, benefit or conditional right has been withheld by a state. For example, as a condition to obtaining or maintaining employment state employees have been required to subscribe to oaths which declare their nonadvocacy of subversive activities (*Pockman* v. *Leonard, supra,* 39 Cal.2d 676) ; as have county employees

(*Hirschman* v. *County of Los Angeles,* 39 Cal.2d 698 [249 P.2d 287, 250 P.2d 145]; *Steiner* v. *Darby,* 88 Cal.App.2d 481 [199 P.2d 429]), municipal employees (*Garner* v. *Board of Public Works of Los Angeles,* 341 U.S. 716 [71 S.Ct. 909, 95 L.Ed. 1317], affirming *Garner* v. *Board of Public Works,* 98 Cal.App.2d 493 [220 P.2d 958]), public school teachers (*Adler* v. *Board of Education,* 342 U.S. 485 [72 S.Ct. 380, 96 L.Ed. 517, 27 A.L.R.2d 472]; *Steinmetz* v. *California State Board of Education,* 44 Cal.2d 816 [285 P.2d 617]; *Board of Education* v. *Eisenberg,* 129 Cal.App.2d 732 [277 P.2d 943]; *Board of Education* v. *Wilkinson,* 125 Cal.App.2d 100 [270 P.2d 82]), and candidates for public offices (*Gerende* v. *Baltimore etc. Board of Elections,* 341 U.S. 56 [71 S.Ct. 565, 95 L.Ed. 745]; *Shub* v. *Simpson,* 196 Md. 177 [76 A.2d 332]). The right to a bounty or other benefits from the state has been so conditioned in the case of applicants for state unemployment benefits. (*State* v. *Hamilton,* 92 Ohio App. 285 [110 N.E.2d 37]; *Dworken* v. *Collopy,* (Ohio) 91 N.E.2d 564.) Even the right to vote (*Opinion of the Justices,* 252 Ala. 351 [40 So.2d 849]), and to citizenship (*United States* v. *Schwimmer,* 279 U.S. 644 [49 S.Ct. 448, 73 L.Ed. 889]) has been so conditioned.

The plaintiff contends that the constitutional amendment and implementing legislation are invalid for other reasons based on constitutional guarantees. Such contentions are without merit in view of what has been said in disposing of the basic contentions presented.

Attention has been directed to the recent decision in *Pennsylvania* v. *Nelson,* 350 U.S. 497 [76 S.Ct. 477, 100 L.Ed. 640] (April 2, 1956), wherein the Supreme Court declared invalid a Pennsylvania penal provision (Pa. Penal Code, § 207, 18 Purdon's Pa. Stat. Ann., § 4207) which made it a crime to advocate the violent overthrow of the federal or state government. Reasons for the decision in that case were that Congress had occupied the field to the exclusion of "parallel" state legislation; that the dominant interest of the federal government required that such "prosecutions" should be exclusively within the control of the federal government, and that the "Pennsylvania Statute presents a peculiar danger of interference with the federal program." It is clear from the opinion of the court in that case that the exclusion of state sedition legislation was limited to the imposition of criminal penalties. The court directed its attention to "anti-sedition statutes, criminal anarchy laws, criminal syndicalist

laws, etc.'' No reference is made to the many so-called loyalty oath cases considered by the court in recent years. The court's intention not to change or modify the established law in those cases by what it said in the Nelson case appears from its later opinion in *Slochower* v. *Board of Education,* 350 U.S. 551 [76 S.Ct. 637, 100 L.Ed. 692], decided on April 9, 1956, one week after the court's decision in the Nelson case. In speaking of balancing the state's interest in the loyalty of certain persons against the interests of those persons in their individuals rights, the court referred by way of illustration to its earlier decisions in *Adler* v. *Board of Education, supra,* 342 U.S. 485, and *Garner* v. *Board of Public Works of Los Angeles, supra,* 341 U.S. 716, 720. In both of those cases the court upheld the validity of state legislation which required, as a condition to acquiring or maintaining particular privileges or rights by certain persons, that such persons refrain from advocating the violent overthrow of our form of government. If in the present case the constitutional amendment and implementing legislation infringe upon an area occupied exclusively by Congress within the scope of the decision in the Nelson case, certainly the same conclusion would be true of the enactments involved in the Garner and Adler cases and the court would not have approved those decisions in the Slochower case. Furthermore, in any consideration of the possible application of the Nelson case to the case at bar, it would be unreasonable to conclude that the federal government intends to or has occupied the field of state taxation.

Finally, it should be observed that we are here dealing with questions of law and not with any questions of fact with reference to the activities of the plaintiff organization. As hereinbefore noted, there is attached to the protest filed with the payment of the tax sought to be recovered a statement of the principles and objectives of the plaintiff in furtherance of its religious activities. Those principles and doctrines reflect the high ideals of morality and personal conduct which are basic in the foundation' of our system of government, both state and national. They are noble in purpose and inspirational in tone. It is inconceivable that an organization actuated by the doctrinal pronouncements there declared would knowingly harbor within itself any person or group of persons who would engage in the subversive activities referred to in section 19 of article XX. It is taken for granted that an organization actuated by those high purposes and ideals

would be the first to champion the efforts of the state to protect itself against the destruction of those guarantees which are necessary to the existence of the plaintiff and to the preservation of the fundamental rights which it otherwise enjoys. But an assumed fact of the nonexistence of subversion in an organization is not enough. The law demands the ascertainment of that fact for purposes of taxation and section 32 requires the cooperation of the plaintiff in establishing it.

No good reason has been advanced why churches as well as all of the many other organizations seeking exemption from taxation should not be required to comply with the law of the state providing for assistance to the county assessors in the discharge of their duties to ascertain the facts which would justify the exemption. By the plaintiff's failure and refusal to allege that it has complied with the law which would enable it to qualify for the exemption the complaint fails to state a cause of action. The demurrer was therefore properly sustained without leave to amend.

The judgment is affirmed.

Schauer, J., Spence, J., and McComb, J., concurred.

TRAYNOR, J.—I dissent.

Section 19 of article XX of the California Constitution and section 32 of the Revenue and Taxation Code unjustifiably restrict free speech. Section 19 in effect imposes a penalty in the form of withholding a tax exemption upon any person or organization that chooses to speak in a certain manner, namely, by advocating overthrow of the federal or state governments by force or support of a foreign government against the United States in event of hostilities. Section 32 provides a special method of enforcing these restrictions as to certain tax exemptions. A person claiming one of these exemptions must make a declaration that he does not advocate the conduct specified in section 19. In effect the provisions impose a tax measured by the exemptions allowed to others not only upon those who advocate overthrow of the government by force or support of a foreign government in event of hostilities, but also upon those who do not advocate such conduct but refuse to declare that they do not.

A restraint on free speech is not less a restraint when it is imposed indirectly through withholding a privilege rather than directly through taxation, fine, or imprisonment. This

court so held in *Danskin* v. *San Diego Unified Sch. Dist.*, 28 Cal.2d 536, 547-548 [171 P.2d 885], involving a comparable privilege, the use of school buildings for public meetings. "It is true that the state need not open the doors of a school building as a forum and may at any time choose to close them. Once it opens the doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable. . . . The very purpose of a forum is the interchange of ideas, and that purpose cannot be frustrated by a censorship that would label certain convictions and affiliations suspect, denying the privilege of assembly to those who hold them, but granting it to those whose convictions and affiliations happen to be acceptable and in effect amplifying their privilege by making it a special one. In the competitive struggle of ideas for acceptance they would have a great strategic advantage in making themselves known and heard in a forum where the competition had been diminished by censorship, and their very freedom would intensify the suppression of those condemned to silence. It is not for the state to control the influence of a public forum by censoring the ideas, the proponents, or the audience; if it could, that freedom which is the life of a democratic assembly would be stilled. And the dulling effects of censorship on a community are more to be feared than the quickening influence of a live interchange of ideas."

The tax exemptions in question are likewise comparable to the privilege of using the mails at less than cost. In *Hannegan* v. *Esquire, Inc.*, 327 U.S. 146, 156 [66 S.Ct. 456, 90 L.Ed. 586], the court declared that, "grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever. . . . Under that view the second-class rate could be granted on condition that certain economic or political ideas not be disseminated. The provisions of the [statute] . . . would have to be far more explicit for us to assume that Congress made such a radical departure from our traditions and undertook to clothe the Postmaster General with the power to supervise the tastes of the reading public of the country." The dissent of Mr. Justice Brandeis in *United States ex rel. Milwaukee Social Democratic Publishing Co.* v. *Burleson*, 255 U.S. 407, 430-431 [41 S.Ct. 352, 65 L.Ed. 704], invoked in the Esquire case, reasoned that, "Congress may not through its postal police power put limitations upon the freedom of the press which if directly attempted would be

unconstitutional. This court also stated in *Ex parte Jackson* that 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' It is argued that although a newspaper is barred from the second-class mail, liberty of circulation is not denied, because the first and third-class mail and also other means of transportation are left open to a publisher. Constitutional rights should not be frittered away by arguments so technical and unsubstantial. 'The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name.' (*Cummings* v. *Missouri,* 4 Wall. (U.S.) 277, 325 [18 L.Ed. 356].) The Government, might, of course, decline altogether to distribute newspapers; or it might decline to carry any at less than the cost of the service; and it would not thereby abridge the freedom of the press, since to all papers other means of transportation would be left open. But to carry newspapers generally at a sixth of the cost of the service and to deny that service to one paper of the same general character, because to the Postmaster General views therein expressed in the past seem illegal, would prove an effective censorship and abridge seriously freedom of expression.''

Although free speech may not be an absolute right, it must be jealously guarded. As the court stated in *American Communications Assn.* v. *Douds,* 339 U.S. 382, 412 [70 S.Ct. 674, 94 L.Ed. 925], the first amendment ''requires that one be permitted to advocate what he will unless there is a clear and present danger that a substantial public evil will result therefrom.'' That test is still a valid one. It was not repudiated in *Dennis* v. *United States,* 341 U.S. 494 [71 S.Ct. 857, 95 L.Ed. 1137]. The court was there concerned not to abolish the clear and present danger test but to bend it to the special situation of a critical time and the diabolic strategy of the Communist Party. As before, the key word in its solution was danger: '' 'In each case [courts] must ask whether the gravity of the ''evil,'' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' '' (341 U.S. at 510.) There was evidence that the defendants, members of the Communist Party, advocated overthrow of the government by force and violence. The jury was instructed that it could not find them guilty under the statute unless it found that they had conspired with the intent that their advocacy ''be of a rule or principle of action and by language reasonably and ordinarily calculated to incite

persons to such action, all with the intent to cause the overthrow or destruction'' of the government by force. The jury had also to determine whether the defendants intended to overthrow the government ''as speedily as the circumstances would permit.'' Moreover, the court of appeals held that the record supported the conclusion that ''the Communist Party is a highly disciplined organization, adept at infiltration into strategic positions, use of aliases, and double-meaning language; that the Party is rigidly controlled; that Communists, unlike other political parties, tolerate no dissension from the policy laid down by the guiding forces, but that the approved program is slavishly followed by the members of the Party. . . .'' (341 U.S. at 498, 511-512.)

It is essential in each case to inquire into the character of the speech to be restrained and the surrounding circumstances. The probability that advocacy will break out in action depends on the numbers, methods, and organization of the advocates.

The state provisions in question penalize advocacy in a totally different context from that in the Dennis case. The penalty falls indiscriminately on all manner of advocacy, whether it be a call to action or mere theoretical prophecy that leaves the way open for counteradvocacy by others. Moreover, with regard to advocacy of support of a foreign government, the state provisions penalize not only advocacy during actual hostilities but also advocacy during peacetime of action during hostilities that may occur, if at all, in the remote future.

There is no evidence in the present case that plaintiff church or its members advocate the overthrow of the government by force or otherwise. There is no evidence that plaintiff church or any of the organizations seeking tax exemptions are infiltrated by Communists or other disloyal persons, or that they are in any danger of such infiltration. The evidence is all to the contrary. It is baldly assumed that plaintiff church advocates the overthrow of the government by force because it refuses to declare that it does not. It is one thing for a court to sustain convictions after it has concluded following a full trial that it is dealing with an organization wielding the power of a centrally controlled international Communist movement; it is quite another to deprive a church of a tax exemption on the ground that it will not declare that it does not advocate overthrow of the government.

If it is unconstitutional to restrain plaintiff from advocating overthrow of the government, it is *a fortiori* unconstitu-

tional to require it to prove or declare that it does not advocate overthrow of the government. (See *Danskin* v. *San Diego Unified Sch. Dist.*, 28 Cal.2d 536, 548 [171 P.2d 885].) Such a restraint is the more vicious because it penalizes not only those who advocate overthrow of the government but also those who do not but will not declare that they do not. There are some who refuse to make the required declaration, not because they advocate overthrow of the government, but because they conscientiously believe that the state has no right to inquire into matters so intimately touching political belief. Rightly or wrongly they fear that such an inquiry is the first step in censorship of unpopular ideas. Even in the face of a bona fide danger, the state has no power to embark on an unnecessary wholesale suppression of liberty. (See *Butler* v. *Michigan*, 25 U.S.L. Week 4165, 4166.)

The majority opinion, however, invokes the rule that the government may attain a legitimate objective through means reasonably related thereto even though there is an incidental restraint on speech. Thus, in securing qualified and trustworthy employees for government service a loyalty oath may be required, not for the purpose of restraining speech, but as a means of selection. (*Adler* v. *Board of Education*, 342 U.S. 485, 492 et seq. [72 S.Ct. 380, 96 L.Ed. 517, 27 A.L.R.2d 472] ; *Garner* v. *Board of Public Works Los Angeles*, 341 U.S. 716, 720 et seq. [71 S.Ct. 909, 95 L.Ed. 1317] ; *Gerende* v. *Baltimore etc. Board of Elections*, 341 U.S. 56 [71 S.Ct. 565, 95 L.Ed. 745] ; *Steinmetz* v. *California State Bd. of Education*, 44 Cal.2d 816 [285 P.2d 617] ; *Pockman* v. *Leonard*, 39 Cal.2d 676 [249 P.2d 267].) Similarly, *American Communications Assn.* v. *Douds*, 339 U.S. 382 [70 S.Ct. 674, 94 L.Ed. 925], held that in seeking to keep interstate commerce free of political strikes, Congress may require labor officials to file non-Communist affidavits as a condition to their unions' invoking the jurisdiction of the National Labor Relations Board.

In such cases it is necessary to determine whether the provisions that incidentally restrain speech are in fact reasonably related to the attainment of the governmental objective. In *Lawson* v. *Housing Authority*, 270 Wis. 269 [70 N.W.2d 605], cert. denied, 350 U.S. 882 [76 S.Ct. 135, 100 L.Ed. 778], the Supreme Court of Wisconsin considered a federal statute that provided in effect that no housing unit constructed under the statute could be occupied by a member of an organization designated as subversive by the attorney general. Pursuant to this statute, the Milwaukee Housing Authority adopted a reso-

lution that required its tenants to execute a certificate of non-membership in the listed organizations. The court held the resolution unconstitutional, and after discussing the Douds case stated: ''It is beyond our power to comprehend how the evil which might result from leasing units in a federally aided housing project to tenants who are members of organizations designated subversive by the Attorney General is in any way comparable in substantiality to that which would result to the general welfare through communists in control of labor organizations disrupting commerce by calling strikes to carry out Communist Party policy. This court deems the possible harm which might result in suppressing the freedoms of the First Amendment outweigh any threatened evil posed by the occupation by members of subversive organizations of units in federally aided housing projects.'' (270 Wis. at 287-288.) In considering the same problem, the Supreme Court of Illinois pointed out that, ''The purpose of the Illinois Housing Authority Act is to eradicate slums and provide housing for persons of low-income class. [Citation.] It is evident that the exclusion of otherwise qualified persons solely because of membership in organizations designated as subversive by the Attorney General has no tendency whatever to further such purpose.'' (*Chicago Housing Authority* v. *Blackman*, 4 Ill.2d 319 [122 N.E.2d 522, 526].)

In the present case the majority opinion thus states the governmental objective: ''Encouragement to loyalty to our institutions and an incentive to defend one's country in the event of hostilities . . . doctrines which the state has plainly promulgated and intends to foster. It is the high purpose residing in its people that the state is attempting to encourage in its endeavor to protect itself against subversive infiltration. . . . Obviously a program of tax exemption designed to promote adherence to the principles of our government but constrained to include within its bounty persons or organizations actively advocating subversion and the support of enemies in time of hostilities, would be wholly without reason and result in its own defeat.''

The issue thus narrows to whether a state can properly restrain free speech in the interest of promoting what appears to be eminently right thinking. A state with such power becomes a monitor of thought to determine what is and what is not right thinking. Great as a state's police power is, however, the United States Supreme Court has yet to sanction its breaking into people's minds to make them orderly. In

holding that school children may not be compelled to salute the flag as a condition to attending public schools, the Supreme Court through Mr. Justice Jackson stated that, "To believe that patriotism will not flourish if patriotic ceremonies are voluntary and spontaneous instead of a compulsory routine is to make an unflattering estimate of the appeal of our institutions to free minds. We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great. But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order. If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us." (*West Virginia Board of Education* v. *Barnette,* 319 U.S. 624, 641-642 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674].)

Advocacy does not occur in an intellectual vacuum. Usually it answers or challenges other advocacy. As Mr. Justice Frankfurter aptly stated in *Dennis* v. *United States,* 341 U.S. 494, 549-550 [71 S.Ct. 857, 95 L.Ed. 1137]: "Of course no government can recognize a 'right' of revolution, or a 'right' to incite revolution if the incitement has no other purpose or effect. But speech is seldom restricted to a single purpose, and its effects may be manifold. A public interest is not wanting in granting freedom to speak their minds even to those who advocate the overthrow of the Government by force. For, as the evidence in this case abundantly illustrates, coupled with such advocacy is criticism of defects in our society. Criticism is the spur to reform; and Burke's admonition that a healthy society must reform in order to conserve has not lost its force. Astute observers have remarked that one of the characteristics of the American Republic is indifference to fundamental criticism. Bryce, The American Commonwealth, c. 84. It is a commonplace that there may be a grain of truth in the most uncouth doctrine, however false and repellant the balance may be. Suppressing advocates of overthrow

inevitably will also silence critics who do not advocate over-throw but fear that their criticism may be so construed. No matter how clear we may be that the defendants now before us are preparing to overthrow our Government at the propi-tious moment, it is self-delusion to think that we can punish them for their advocacy without adding to the risks run by loyal citizens who honestly believe in some of the reforms these defendants advance. It is a sobering fact that in sus-taining the convictions before us we can hardly escape restric-tion on the interchange of ideas.''

Section 32 impedes not only advocacy itself but discussion short of advocacy that may be of the utmost value. As Mr. Justice Jackson pointed out in the Dennis case, ''Of course, it is not always easy to distinguish teaching or advocacy in the sense of incitement from teaching or advocacy in the sense of exposition or explanation,'' and Mr. Justice Frankfurter recognized that, ''there is no divining rod by which we may locate 'advocacy.' Exposition of ideas readily merges into advocacy.'' (341 U.S. at 545, 572.) Yet section 32 compels the cautious to forego discussion for fear they will overstep the line that no divining rod can locate.

Errors in thought or expression are best counteracted by deeper thought and more cogent expression. Only through free discussion can subversive doctrines be understood and effectively combatted. '' 'The interest, which [the First Amendment] guards, and which gives it its importance, pre-supposes that there are no orthodoxies—religious, political, economic, or scientific—which are immune from debate and dispute. Back of that is the assumption—itself an orthodoxy, and the one permissible exception—that truth will be most likely to emerge, if no limitations are imposed upon utterances that can with any plausibility be regarded as efforts to present grounds for accepting or rejecting propositions whose truth the utterer asserts, or denies.' . . . In the last analysis it is on the validity of this faith that our national security is staked.'' (Mr. Justice Frankfurter concurring in *Dennis* v. *United States*, 341 U.S. 494, 550 [71 S.Ct. 857, 95 L.Ed. 1137].)

The majority opinion in the present case goes far beyond any United States Supreme Court decision in upholding legis-lation that restricts the citizen's right to speak freely. Section 19 of article XX, implemented by section 32 of the Revenue and Taxation Code, arbitrarily assumes that those who seek tax exemptions advocate overthrow of the government unless they declare otherwise. The provisions infringe the right to

engage in such advocacy without reference to its seriousness, inhibit free discussion short of advocacy, and penalize the belief that the government has no right to require professions of innocence in the absence of proof of guilt. A law with such consequences cannot stand in the face of the constitutional guarantees.

I would reverse the judgment.

Gibson, C. J., concurred.

CARTER, J.—I dissent.

I approach the consideration of this case with a profound consciousness that the problems involved may have a direct impact upon the stability of our state and federal governments. Evidently those who enacted the legislation here involved felt that it was necessary to preserve the status quo of those governments. On the other hand the plaintiff challenges the enactments as an invasion of fundamental constitutional guarantees to it and other religious institutions. We are, therefore, at the outset, faced with the problem as to what sanctions, in the way of pledges of fealty and loyalty, our government may exact from a taxpayer in order to qualify the latter for a tax exemption granted to all in the same class. The solution of this problem depends upon our interpretation and application of the constitutional guarantees relied upon by plaintiff as barriers against such sanctions.

It must be remembered that while our government was "conceived in liberty," it was born in revolution. The Declaration of Independence was the antithesis of a pledge of allegiance or loyalty to the British government of which the then American colonists were a part. This memorable document epitomized the concept of its framers of the objects and purposes of government and the right of the people to change it by force if necessary. It declared: "We hold these truths to be self-evident: That all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness; that, to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed; that whenever any form of government becomes destructive of these ends, it is the right of the people to alter or to abolish it and to institute new government, laying its foundation on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their

safety and happiness. Prudence, indeed, will dictate that governments long established should not be changed for light and transient causes; and, accordingly, all experience hath shown that mankind are more disposed to suffer while evils are sufferable, than to right themselves by abolishing the forms to which they are accustomed. But when a long train of abuses and usurpations, pursuing invariably the same object, evinces a design to reduce them under absolute despotism, it is their right, it is their duty, to throw off such government and to provide new guards for their future security. Such has been the patient sufferance of these colonies; and such is now the necessity which constrains them to alter their former systems of government."

The events which followed the adoption of the Declaration of Independence by the Continental Congress on July 4, 1776, are well known to every student of American history. These events culminated in the Constitutional Convention at Philadelphia during the summer of 1787 where the Constitution of the United States was drafted. Many of the delegates at the Constitutional Convention had been members of the Continental Congress which had adopted the Declaration of Independence. They were revolutionists in the truest and most dignified sense. It should be remembered that the Declaration of Independence and the Constitution of the United States were prepared by a group of men who had endured tyranny under a monarchial form of government for over three generations. They were the leaders in the struggle which overthrew that government and they sought to establish a government of the people, by the people, and for the people, which would derive its just powers from the consent of the governed. They sought to establish justice, ensure domestic tranquility, promote the general welfare, provide for the common defense and secure the blessings of liberty to themselves and their posterity—a government which would govern without tyranny and without oppression and which would guarantee to the governed all of the liberty that a free people in a homogenous society could enjoy.

The great liberality accorded to the guarantees of freedom of speech and press by those at the head of our government during its formative period is exemplified by the following statement in the First Inaugural Address of President Thomas Jefferson. He there declared: "If there be any among us who would wish to dissolve this union or change its republican form, let them stand undisturbed as monuments of the safety

with which error of opinion may be tolerated where reason is left free to combat it.'' This same concept was again expressed by Mr. Jefferson in his letter to Benjamin Rush in these words: ''I have sworn upon the altar of God eternal hostility against every form of tyranny over the mind of man.'' This concept was more recently depicted by Mr. Justice Brandeis in *Whitney* v. *California*, 274 U.S. 357 [47 S.Ct. 641, 71 L.Ed. 1095], in words that will forever be a part of our American heritage. ''Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the process of popular government, no danger flowing from free speech can be deemed clear and present unless the incidence of the evil apprehended is so imminent that it may be fatal before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.''

Over a century and a half has elapsed since the above quoted utterances of Thomas Jefferson. Our government has withstood one major revolution and several minor armed rebellions but the fundamental basic concept of civil liberties embraced within the Bill of Rights has remained unimpaired.

It is worthy of note that the framers of the Constitution of the United States saw fit to exact of the person who assumed the office of President a very simple oath which reads as follows: ''I do solemnly swear (or affirm) that I will faithfully execute the office of President of the United States, and will, to the best of my ability, preserve, protect, and defend the Constitution of the United States.'' (U.S. Const., art. II, § 1.) This is the only oath mentioned in the Constitution. Notwithstanding the great trust reposed in and power conferred upon the President of the United States by the Constitution and laws enacted by Congress, no other oath or pledge of loyalty may be exacted of him. Nevertheless no president has ever been suspected of disloyalty. It may be said with confidence that history has demonstrated the wisdom of the framers of the Constitution in drafting an oath so simple and yet so effective that it has endured the tests of time and trial. The past at least is secure. But such an oath was not deemed sufficient to insure the loyalty and fealty of the Vice President, members of Congress and other officials of our

national government. Although no other official of our government possesses the power or authority of the President, they are required to take an oath much more exacting as it amounts to a pledge of allegiance. This oath is contained in an act of Congress and is as follows: "I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God." (U.S. Code, title V, § 16, pp. 10-11, U.S.C. 1952 ed., titles 1-14.) I find no fault with this oath and recognize the propriety of exacting such an oath from one who assumes an official position with our government. It will be observed, however, that neither of the above quoted oaths has the slightest resemblance to the test oath here involved. In commenting on such an oath Dr. Carl Joachim Friedrich, Professor of Government, of Harvard University had the following to say: "It is depressing to realize that the oath has always cropped up as a political device when the political order was crumbling. In the period of religious dissensions the oath of allegiance made its appearance in England as an instrument of intolerance and, a little later, of royal oppression. James Stuart, the tiresome pedant on the throne, sought refuge in an oath required of all ministers and the like (most teaching then being religious). At that time the imperial pretensions of the 'reformed' papacy, the right of the Pope claimed by the Jesuits to absolve the subjects of an heretical king from their allegiance, made the king desirous of testing the loyalty of his more influential subjects. Yet not many years later his son's head rolled into the sand.

"Following that, Oliver Cromwell in his desperate efforts to find a legitimate basis for his dictatorial regime, demanded an oath preceding the election of parliament in 1653 that no one participating in the election would allow the constitution 'as settled in one person and parliament' to be disturbed. But Cromwell died and the oath was forgotten. The rupture which the oath was supposed to heal did not disappear until toleration and a liberal, truly constitutional government had taught people how Catholic and Protestant, how parliamentarian and authoritarian, how Whig and Tory could live peaceably together, with no one requiring the other to swear oaths which were either unnecessary or ineffectual.

"And where have oaths appeared in our own day? In Fascist Italy and in Nazi Germany. In both of these countries the dictators have promulgated requirements according to which the teachers and professors have to swear an oath of allegiance to the Duce, the Leader. But what, one may ask, was the object of demanding such a declaration from men who every day were obliged to mold their words and their teachings to the Fascist creed? The purpose was to humiliate or to destroy them. There were plenty of men who were known to the students as non-Fascists, non-Nazis. If they could be forced into swearing their allegiance to the official creed, they were morally discredited, they were shown to be trimmers. What is more, the man of integrity and of faith is the really dangerous enemy. He would not consent. He would protest. Gaetano Salvemini, now teaching at Harvard, is such a man. He knew the game of Mussolini and he left." (Article entitled "Teacher's Oaths," published in the January, 1936 issue of Harper's, vol. 172 at p. 171.)

At this point, I cannot refrain from quoting the words of warning contained in the powerful concurring opinion of Mr. Justice Black in *Wieman* v. *Updegraff,* 344 U.S. 183, 192 [73 S.Ct. 215, 97 L.Ed. 216]: "History indicates that individual liberty is intermittently subjected to extraordinary perils. . . . The first years of our Republic marked such a period. Enforcement of the Alien and Sedition Laws by zealous patriots who feared ideas made it highly dangerous for people to think, speak, or write critically about government, its agents, or its policies, either foreign or domestic. Our constitutional liberties survived the ordeal of this regrettable period because there were influential men and powerful organized groups bold enough to champion the undiluted right of individuals to publish and argue for their beliefs however unorthodox or loathsome. Today, however, few people and organizations of power and influence argue that unpopular advocacy has this same wholly unqualified immunity from governmental interference. For this and other reasons the present period of fear seems more ominously dangerous to speech and press than was that of the Alien and Sedition Laws. Suppressive laws and practices are the fashion. The Oklahoma oath statute is but one manifestation of a national network of laws aimed at coercing and controlling the minds of men. Test oaths are notorious tools of tyranny. *When used to shackle the mind they are, or at least they should be, unspeakably odious to a free people.* Test oaths are made still more danger-

ous when combined with bills of attainder which like this Oklahoma statute impose pains and penalties for past lawful associations and utterances.

". . . Our own free society should never forget that laws which stigmatize and penalize thought and speech of the unorthodox have a way of reaching, ensnaring and silencing many more people than at first intended. *We must have freedom of speech for all or we will in the long run have it for none but the cringing and the craven.* And I cannot too often repeat my belief that the right to speak on matters of public concern must be wholly free or eventually be wholly lost." (Emphasis added.)

History is replete with accounts of the many stratagems created by tyrants to violate the individual's liberty. But it is also replete with accounts of man's constant warfare against these devices and victories won by courageous judges, legislators, administrators, lawyers, and citizens.

In 1787, the founders of this nation assumed that they had settled these matters for all time when they drew upon the lessons of history and wrote a Bill of Rights to assure the individual permanent freedom from official tyranny, and the right freely to participate in the process of self-government.

"Such constitutional limitations arise from grievances, real or fancied, which their makers have suffered, and should go *pari passu* with the supposed evil. They withstand the winds of logic by the depth and toughness of their roots in the past. Nor should we forget that what seems fair enough against a squalid huckster of bad liquor may take on a very different face, if used by a government determined to suppress political opposition under the guise of sedition." (Learned Hand, J., in *United States* v. *Kirschenblatt* (C.C.A.2d), 16 F.2d 202, 203 [51 A.L.R. 416].)

"These specific grievances and the safeguards against their recurrence were not defined by the Constitution. They were defined by history. Their meaning was so settled by history that definition was superfluous. . . . 'Upon this point a page of history is worth a volume of logic.' *New York Trust Co.* v. *Eisner,* 256 U.S. 345, 349 [41 S.Ct. 506, 65 L.Ed. 963, 16 A.L.R. 660]." (Frankfurter, J., *United States* v. *Lovett* (1945), 328 U.S. 303, 321, 323 [66 S.Ct. 1073, 90 L.Ed. 1252].)

"It would not be possible to add to the emphasis with which the framers of our Constitution and this court (in *Boyd* v. *United States,* 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746], in *Weeks* v. *United States,* 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed.

652, L.R.A. 1915B 834], and in *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426]) have declared the importance to *political liberty* and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two amendments. The effect of the decisions cited is: That such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty, and private property;' that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties to the other fundamental rights of the individual citizen—the right to trial by jury, to the writ of habeas corpus, and to due process of law. It has been repeatedly decided that these Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts, or by well-intentioned but mistakenly over-zealous executive officers." (*Gouled* v. *United States* (1920), 255 U.S. 298, 303 [41 S.Ct. 261, 65 L.Ed. 647], Clarke, J.) (Emphasis supplied.) See also: Brandeis, J. dissenting, *Olmstead* v. *United States* (1927), 277 U.S. 438, 476, 478 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376], and *Jones* v. *Securities & Exch. Com.* (1935), 298 U.S. 1, 28 [56 S.Ct. 654, 80 L.Ed. 1015].

"If there is one fixed star in our Constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess* by word or act their faith therein." (Jackson, J., in *West Virginia State Board of Education* v. *Barnette* (1943), 319 U.S. 624, 642 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674].) (Emphasis supplied.)

The story of the rise and fall of the *oath ex-officio* needs to be retold. It will be recalled that the early 1200's were marked by the adoption of this procedural device in the ecclesiastical courts. In this period the inquisitional oath began to take the place of the trial by compurgation oaths in the ecclesiastical courts. The compurgation trials conducted with the device of "oath helpers" had become little better than a farce. The new method of the *oath ex-officio* was one which pledged the accused to answer truly and was followed by a rational process of judicial probing by questions on the specific details of the affair. In a footnote by John H. Wigmore in 15 Harvard Law Review 615, it is stated that by the

middle of the 13th century ''the new oath became the customary instrument in the papal inquisition of heresy; which, indeed, owed its effectiveness largely to the new methods.''

Liberals in the church courts insisted that the oath could only be imposed if the court had a rational hypothesis for proceeding against the suspect. Such rational hypothesis could either be *fama publica* or *clamosa insinnatio*. However, this was too mild for those who wanted a more vigorous pursuit of heretics and schismatics, and they finally prevailed in establishing the doctrine that the oath could be imposed by the church official *ex-officio* without any antecedent foundation. This extreme position, however, directly resulted in the downfall of the power of the ecclesiastical courts because of the public indignation it aroused.

The ordinary course of trial by the Inquisition was this. A man would be reported to the inquisitor as of ill-repute for heresy, or his name would occur in the confessions of some other prisoners. A secret inquisition would be made and all accessible evidence against him would be collected. When the mass of surmises and gossip, exaggerated and distorted by the natural fear of the witnesses, eager to save themselves from the suspicion of favoring heretics, grew sufficient for action, the blow would fall. The accused was then prejudged. He was assumed to be guilty, or he would not have been put on trial, and virtually his only mode of escape was by confessing the charges against him, abjuring heresy, and accepting whatever punishment might be imposed on him in the shape of penance. Persistent denial of guilt and assertion of orthodoxy, when there was evidence against him, rendered him an impenitent, obstinate heretic, to be abandoned to the secular arm and consigned to the state. (See Henry Charles Lea, A History of the Inquisition of the Middle Ages, I, p. 407.)

However, the English people early registered their resistance to general inquisitorial methods and their attendant abuses. A statute passed in 1360 in the reign of Edward III, provided, ''that all general inquiries before this time granted within any seignories, for the mischiefs and oppression which have been done to the people by such inquiries, shall utterly cease and be repealed.'' (34 Edw. III, ch. 1.)

But in 1583 the Court of High Commission in Causes Ecclesiastical, under the leadership of Archbishop Whitgift, started a crusade against heresy wherever it could be found,

examining suspected persons under oath in most extreme *ex-officio* style.

In 1609 Sir Edward Coke, as Chief Justice of Common Pleas, granted prohibition against the High Court of Ecclesiastical Causes in *Edward's* case. (13 Rep. 9.) Edward had been charged with libel and the church court put him under the *ex-officio* oath to compel him to state his meaning of the libelous words he was accused of uttering. The common law court took jurisdiction away from the church court upon the ground, among others, that "in cases where a man is to be examined upon his oath, he ought to be examined upon acts or words, and not of the intentions or thought of his heart; and if any man should be examined upon his oath of the opinion he holdeth concerning any point of religion, he is not bound to answer the same."

But the oath *ex-officio* persisted and the Court of the Star Chamber began during James' reign to use the *ex-officio* oath in stamping out sedition. Here the common law courts were powerless to prevent employment of the oath procedure because they lacked jurisdiction over the Court of the Star Chamber.

In 1639 the Court of the Star Chamber examined John Lilburn, "Freeborn John," an opponent of the Stuarts, on a charge of printing or importing certain heretical and seditious books. Lilburn refused to answer questions "concerning other men, to insnare me, and to get further matter against me." The Council of the Star Chamber condemned him to be whipped and pilloried for his "boldness *in refusing to take a legal oath*," without which many offenses might go "undiscovered and unpunished." (See 3 How. State Trials 1315, et seq.)

The whip that lashed "Freeborn John" smashed the Court of the Star Chamber as well. In July, 1641, Parliament abolished the Court of the Star Chamber, the Court of High Commission for Ecclesiastical Causes, and provided by statute that no ecclesiastical court could thereafter administer an *ex-officio* oath on penal matters. In 1645 the House of Lords set aside Lilburn's sentence and in 1648 Lilburn was granted £3000 reparation for the whipping which he had received.

Meanwhile, the scene of struggle against oaths *ex-officio* was carried to colonial America. The story is well told by R. Carter Pittman in 21 Virginia Law Rev. 763 from which the following quotations are taken:

"The settlement of the English colonials in the new world

took place at a time in English History when opposition to the *ex-officio* oath of the ecclesiastical courts was most pronounced, and at the period when the insistence upon the privilege against self-incrimination in the courts of common law had begun to have decided effect. . . . The *ex-officio* oath, as employed in the ecclesiastical courts, which regulated the most intimate details of men's daily life, and more particularly by the Court of High Commission, was possibly the most hated instrument employed to create the unhappy plight of these Puritans and Separatists. . . .

"About getting out of England there was much 'red tape' and it consisted in the most part of taking oaths—the oath of Supremacy and the oath of Allegiance, etc. For days and weeks thousands waited aboard ship in the river Thames until *this oath ordeal was over* and after that they were forced with a refined cruelty to say the prayers in the Anglican prayer books twice a day at sea. . . ."

The trial of Mrs. Ann Hutchinson before Governor Winthrop of Massachusetts in the year 1637 was recalled by Mr. Justice Black in *Adamson* v. *California,* 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223], when he commented at page 88:

"Mrs. Hutchinson was tried, if trial it can be called, for holding unorthodox religious views. People with a consuming belief that their religious convictions must be forced on others rarely ever believe that the unorthodox have any rights which should or can be rightfully respected. As a result of her trial and *compelled admissions,* Mrs. Hutchinson was found guilty of *unorthodoxy* and banished from Massachusetts. The lamentable experience of Mrs. Hutchinson and others, contributed to the over-whelming sentiment that demanded adoption of the *Constitutional Bill of Rights.* The founders of this Government wanted no more such 'trials' and punishments as Mrs. Hutchinson had to undergo. They wanted to erect barriers that would bar legislators from passing laws that encroached on the domain of belief, and that would, among other things, strip courts and *all public officers of a power to compel people to testify against themselves."* (Emphasis supplied.)

But the ingenuity of those who would use the oath against the unorthodox was undaunted.

See *Harrison* v. *Evans,* 1 English Reports, 1437, decided by the House of Lords in 1767. Evans was a Protestant Dissenter and this fact was known to the Lord Mayor of London. Nevertheless, the Mayor appointed Evans to fill a vacancy as

sheriff, despite the existence of an act providing that no person should be admitted to any office who had not, within the twelve preceding months "received the sacrament of the Lord's Supper according to the rites of the Church of England." Because of this statute Evans could not take the oath of office or assume it, and he was assessed for a statutory penalty of £600 which was made applicable to any citizen who refused to assume an office after being appointed thereto.

The House of Lords, by a 6 to 1 vote, ruled with the dissenting Evans, overturned the judgments of the lower courts and returned to him his £600.

*"Test oaths, designed to impose civil disabilities* upon men for their beliefs rather than for unlawful conduct were an abomination to the founders of this nation. This feeling was made manifest in Article VI of the Constitution which provides that *no religious test shall ever be required as a qualification to any office or public trust under the United States."* (Black, J., dissenting *In re Summers* (1945), 325 U.S. 561, 576 [65 S.Ct. 1307, 89 L.Ed. 1795].) (Emphasis supplied.)

"No purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed. It cannot be denied, for example, *that the religious test oath* or the restrictions upon assembly then prevalent in England would have been regarded as measures which the Constitution prohibited the American Congress from passing." (Emphasis supplied.) (*Bridges* v. *California* (1941), 314 U.S. 252 at 265 [62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346].)

It is revealing to note that test oaths and the struggle against them arose at a time when the division between church and state was in its early stages, when the separation was far from complete. The immunity from compulsory disclosure which ultimately developed affected not only the right of the individual to worship as he pleased but also his right, notwithstanding his place or mode of worship, to hold political office. The protection accorded religious belief developed hand in hand with nonsectarianism in government.

This policy has been recognized in the United States. While the original purpose behind the abolition of the test oath may have been to further religious liberty, the effect has been to extend political liberty. The following statement is illustrative: "This conjunction of liberties is not peculiar to religious activity and institutions alone. The First Amendment

gives freedom of mind the same security as freedom of conscience. *Cf. Pierce* v. *Society of Sisters,* 268 U.S. 510 [45 S.Ct. 571, 69 L.Ed. 1070]. Great secular causes, with small ones, are guarded. The grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones. And the rights of free speech and a free press are not confined to any field of human interest." (*Thomas* v. *Collins,* 323 U.S. 516, 531 [65 S.Ct. 315, 89 L.Ed. 430].)

The California 1897 Direct Primary Act permitted political parties to require persons, as a condition of voting at the primary, to give an oath that they would thereafter support the nominees of that party. That statute was declared unconstitutional and the Supreme Court, in *Spier* v. *Baker* (1898), 120 Cal. 370, said at page 379 [52 P. 659, 41 L.R.A. 196]: ". . . And the moment you recognize the existence of power in the legislature to create tests in these primary elections, you recognize the right of the legislature to create any test which to that body may seem proper. While the test prescribed in this act may be said to be a most reasonable one, yet the right to make it carries with it the right to make tests most unreasonable. If the power rests in the legislature to create a test, then the power is found in a Democratic legislature to make the test at a primary election a belief in the free coinage of silver at the ratio of sixteen to one, and the same power is found in a Republican legislature to make the test a belief in the protective tariff. If such a power may be sustained under the constitution, then the life and death of political parties are held in the hollow of the hand by a state legislature."

In *Thomas* v. *Collins,* 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430], the same thought is expressed: "But it cannot be the duty, because it is not the right of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. *In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.*" (Emphasis supplied.)

In the light of the foregoing discussion, let us consider the attacks made by plaintiff upon the oath here required. It is contended, with merit, that the oath here is unconstitutional in that it violates the equal protection clauses of both

the federal and state Constitutions and that it also violates the First Amendment to the Constitution of the United States. Section 32 makes an exception insofar as the householder's $100 exemption on personal property is concerned. While it cannot be denied that the Legislature in its wisdom may classify in order that certain evils may be avoided in the future, such classification must bear a reasonable relation to the evil to be avoided. There is here no reasonable classification when the evil to be avoided is considered. There is no evidence that any of the churches or veterans here involved advocated, or intended to advocate, the forbidden political philosophy. The constitutional amendment and section 32 appear to be a sort of shotgun attempt on the part of the Legislature to hit an undefined object. In other words, there is no relation between the object to be achieved and the tactics taken to achieve it. A statement made in the majority opinion clearly shows the fallacy in the entire affair. That statement reads as follows: ''By its enactment [section 19 of article XX] the people of the state declared the public policy of withholding from the owners of property in this state *who engage in the prohibited activities* the benefits of tax exemption. The denounced activities are criminal offenses under state law (Stats. 1919, p. 281), and the act of Congress known as the Smith Act (54 Stat. 670) makes it unlawful to advocate the overthrow of the government by force and violence.'' It should be emphatically stated and understood that not one of the churches or veterans here involved has been so much as accused of subversive activities. But through their refusal to take the unconstitutional (as I believe) oath, they are penalized in advance for something they have not done and will, in all probability, never do. By the majority opinion we are informed that the reason for the oath is to protect state revenues from impairment by those who would seek to destroy it by unlawful means. An entirely different situation would be presented had any of those involved sought to destroy the state, but here only future *highly problematical* activity is forsworn although the tax is levied for past ownership of property to which the exemption was applicable. Just why charitable institutions are singled out as presenting the greatest danger to this country in time of peace or war is not made clear in the majority opinion. It is Hornbook law that legislation classifying certain groups for corrective purposes must bear a reasonable

relationship to the object to be achieved. Churches would, indeed, seem to me to be the least likely subjects of classification for legislative measures to correct the evil thought to exist. Veterans, also, are those who have risked their lives or have been willing to risk them to uphold the ideals for which this country stands. The exemptions were granted, in the first instance, so that religious work might be carried on with the least amount of tax burden possible to the end that the money saved thereby might be used to promote the general welfare; in the second instance, to veterans because they gave up homes, families and positions to promote the general welfare insofar as protecting this country from an enemy was concerned. It hardly seems logical to assume that laws removing the tax exemptions from those dedicated to the promotion of the general welfare because they *might*, in the future, decide to do a turn-about-face and *destroy* the general welfare can be said to be a reasonable classification. If there is one principle that has always (heretofore) been clearly understood in this country it is that every person is presumed innocent until proven guilty beyond a reasonable doubt. The legislation involved here presumes that one refusing to sign the oath has been, or will soon be, guilty of treasonable conduct. From what is said in the majority opinion it appears that this thought did occur to the members of the court signing it. We are informed that there is a presumption of innocence *but* that the assessor, because of it, is not relieved from making the investigation enjoined on him by law; that his administrative determination is not binding on the tax exemption claimant ''but it is sufficient to authorize him to tax the property as non-exempt and *to place the burden on the claimant to test the validity of his administrative determination in a court of law.*'' What is this but forcing the supposedly subversive organization or person to prove *itself* or *himself* innocent beyond a reasonable doubt?

In testing the reasonableness of the laws under attack here, the next question which presents itself is why are householders excepted from those who must take the oath before any tax exemption is allowed them? We are told that the ''segment of householders in this state is so overwhelmingly large as compared with others chosen for exemption that the cost of processing them would justify their separate classification.'' If this class is so ''overwhelmingly large'' it would appear that if the old adage ''in numbers lie strength'' is

true, that this class should also be required to take the oath prior to claiming the exemption. It would also appear that mere difficulty in "processing" would be of little moment in an undertaking thought to be so vitally necessary. Furthermore, if the principle behind the oath is, as we are told, to prevent those dangerous persons from depleting the state's revenues, it would appear that this "overwhelmingly large" class might, even though the exemption is a relatively small one, deplete it even more than the revenues from those which fall within the legislation. The Supreme Court of the United States said (*Louisville Gas & E. Co.* v. *Coleman,* 277 U.S. 32, 37 [48 S.Ct. 423, 72 L.Ed. 770]) that "The equal protection clause, like the due process of law clause, is not susceptible of exact delimitation. No definite rule in respect of either, which automatically will solve the question in specific instances, can be formulated. Certain general principles, however, have been established in the light of which the cases as they arise are to be considered. In the first place, it may be said generally that the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances, *Kentucky Railroad Tax Cases,* 115 U.S. 321, 337 [6 S.Ct. 57, 29 L.Ed. 414] ; *Magoun* v. *Illinois Trust & Savings Bank,* 170 U.S. 283, 293 [18 S.Ct. 594, 42 L.Ed. 1037], and that it applies to the exercise of all the powers of the state which can affect the individual or his property, including the power of taxation. *County of Santa Clara* v. *Southern Pac. R. Co.,* 18 F. 385, 388-399 [9 Sawy. 165] ; *The Railroad Tax Cases,* 13 F. 722, 733 [8 Sawy. 238]. It does not, however, forbid classification; and the power of the state to classify for purposes of taxation is of wide range and flexibility, provided always, that the classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co.* v. *Virginia,* 253 U.S. 412, 415 [40 S.Ct. 560, 64 L.Ed. 989] ; *Air-way etc. Corp.* v. *Day,* 266 U.S. 71, 85 [45 S.Ct. 12, 69 L.Ed. 169] ; *Schlesinger* v. *Wisconsin,* 270 U.S. 230, 240 [46 S.Ct. 260, 70 L.Ed. 557, 43 A.L.R. 1224]. That is to say, *mere* difference is not enough: the attempted classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily

and without any such basis.' *Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis,* 165 U.S. 150, 155 [17 S.Ct. 255, 41 L.Ed. 666]."

There is in my mind no doubt whatsoever that the legislation with which we are here concerned bears no relation whatsoever to the objective to be achieved. Presumably that objective is to stamp out, by any means at hand, the promulgation of unpopular ideas. While the idea of the overthrow of the government of this country by force and violence in either peace or war is as abhorrent to me as it is to the majority of Americans, I am at a complete loss when it comes to imagining any reasonable theory on which the legislation in question can be considered an effective way of preventing such action. The tax itself is on property owned by churches and used for religious purposes and the exemption applies only when such property is used for such purposes. So far as the veteran's exemption is concerned, the tax to which it applies is also on property. Property taxes and unpopular beliefs or advocacy would appear to be as far apart as the poles and to bear no reasonable relationship one to the other. The classification here involved falls directly within the rule of the Louisville Gas case: it is arbitrary, it does not rest upon a difference bearing a reasonable and just relation to the act in respect to which the classification is proposed; it is a *mere* difference which "is not enough."

THE OATH IS A VIOLATION OF THE CONSTITUTIONAL GUARANTEE OF FREEDOM OF SPEECH:

In *Danskin* v. *San Diego Unified Sch. Dist.,* 28 Cal.2d 536, 542 [171 P.2d 885], we held that "Freedom of speech and of peaceable assembly are protected by the First Amendment of the Constitution of the United States against infringement by Congress. They are likewise protected by the Fourteenth Amendment against infringement by state Legislatures. (*Thomas* v. *Collins,* 323 U.S. 516, 530 [65 S.Ct. 315, 89 L.Ed. 430]; *De Jonge* v. *Oregon,* 299 U.S. 353, 364 [57 S.Ct. 255, 81 L.Ed. 278].) *However reprehensible a Legislature may regard certain convictions or affiliations, it cannot forbid them if they present 'no clear and present danger that they will bring about the substantive evils' that the Legislature has a right to prevent.* 'It is a question of proximity and degree.' (*Schenck* v. *United States,* 249 U.S. 47, 52 [39 S.Ct. 247, 63 L.Ed. 470].) The United States Supreme Court has been alive to the difference between remote dangers and substantial ones, between remote dangers and immediate ones . . . ' . . .

Moreover, the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself must be "substantial," Brandeis, J., concurring in *Whitney* v. *California, supra,* 274 U.S. at page 374; it must be "serious," *id.* 274 U.S. at page 376. And even the expression of "legislative preferences or beliefs" cannot transform minor matters of public inconvenience or annoyance into substantive evils of sufficient weight to warrant the curtailment of liberty of expression. . . .' " (*Bridges* v. *California,* 314 U.S. 252, 261 [62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346], quoting from the concurring opinion of Mr. Justice Brandeis in *Whitney* v. *California,* 247 U.S. 357, 374 [47 S.Ct. 641, 71 L.Ed. 1095].)

A reading of the majority opinion leaves in the minds of the reader the implication that the "clear and present danger" rule was abrogated by the later case of *Dennis* v. *United States,* 341 U.S. 494 [71 S.Ct. 857, 95 L.Ed. 1137]. In the Dennis case it was specifically noted by the court that in the Smith Act "Congress did not intend to eradicate the free discussion of political theories, to destroy the traditional rights of Americans to discuss and evaluate ideas without fear of governmental sanction. Rather Congress was concerned with the very kind of activity *in which the evidence showed these petitioners engaged.*" It will be recalled that we have here *no evidence* that the churches and veterans involved were even so much as accused of the forbidden activities. In the Dennis case the petitioners had been found guilty by a jury of organizing a Communist party in the United States; in knowingly and wilfully teaching and advocating the overthrow of our government by force and violence. The court also held that it had been determined that the evidence amply supported the necessary finding of the jury that the petitioners "were unwilling to work within our framework of democracy, but intended to initiate a violent revolution whenever the propitious occasion appeared." In the majority opinion in the Dennis case it was said that "Overthrow of the Government by force and violence is certainly a substantial enough interest for the Government to limit speech" and speaking of the "clear and present danger" rule it was said "Obviously, the words cannot mean that before the Government may act, it must wait until the *putsch* is about to be executed, the plans have been laid and the signal is awaited. *If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them*

*to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required."* (Emphasis added.) The court expressly rejected the contention that success or probability of success in overthrowing the government was the criterion. The court then, in speaking of prior cases, said that the court had not been "confronted with any situation comparable to the instant one —the development of an apparatus designed and dedicated to the overthrow of the Government, in the context of world crisis after crisis." The Supreme Court then stated the rule, relied upon by the majority here, that "In each case [courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." This rule, following the court's language concerning what constituted a "clear and present" danger and read in the light of the facts as they were stated in the Dennis case, shows the absurdity of this tempest-in-a-teapot which which we are here confronted: there is no showing that the churches and veterans were highly organized into a war-like machine dedicated to the overthrow of the government by force and violence with leaders highly trained and ready to give the "word" when the time was ripe for revolution! The objects of the legislation, the objective and the means used to achieve it are completely unrelated. Where is the "danger" so far as churches and veterans are concerned? And does the denial of a charitable exemption constitute a reasonable attempt to save this country from revolution? Or does the oath involved just constitute an unconstitutional invasion of freedom of speech? In my opinion it constitutes an unconstitutional invasion of freedom of speech with the absurdity of the entire situation pinpointed by the thought that any embryo revolutionist would surely not hesitate to subscribe to such an oath.

As Mr. Justice Douglas said in his dissenting opinion in the Dennis case, "Full and free discussion keeps a society from becoming stagnant and unprepared for the stresses and strains that work to tear all civilization apart.

"Full and free discussion has indeed been the first article of our faith. We have founded our political system on it. It has been the safeguard of every religious, political, philosophical, economic, and racial group amongst us. We have counted on it to keep us from embracing what is cheap and false; we have trusted the common sense of our people to choose the doctrine true to our genius and to reject the rest.

This has been the one single outstanding tenet that has made our institutions the symbol of freedom and equality. We have deemed it more costly to liberty to suppress a despised minority than to let them vent their spleen. We have above all else feared the political censor. We have wanted a land where our people can be exposed to all the diverse creeds and cultures of the world.

"There comes a time when even speech loses its constitutional immunity. Speech innocuous one year may at another time fan such destructive flames that it must be halted in the interests of the safety of the Republic. That is the meaning of the clear and present danger test. When conditions are so critical that there will be no time to avoid the evil that the speech threatens, it is time to call a halt. Otherwise, free speech which is the strength of the Nation will be the cause of its destruction.

"Yet free speech is the rule, not the exception. The restraint to be constitutional must be based on more than fear, on more than passionate opposition against the speech, on more than a revolted dislike for its contents. There must be some immediate injury to society that is likely if speech is allowed."

Mr. Justice Douglas said that "If this were a case where those who claimed protection under the First Amendment were teaching the techniques of sabotage, the assassination of the President, the filching of documents from public files, the planting of bombs, the art of street warfare, and the like, I would have no doubts. The freedom to speak is not absolute; the teaching of methods of terror and other seditious conduct should be beyond the pale along with obscenity and immorality. This case was argued as if those were the facts. The argument imported much seditious conduct into the record. That is easy and it has popular appeal, for the activities of Communists in plotting and scheming against the free world are common knowledge. But the fact is that no such evidence was introduced at the trial." The books on Leninism and Communism, etc., which were involved in the Dennis case were commented on by Mr. Justice Douglas as follows: "Those books are to Soviet Communism what Mein Kampf was to Nazism. If they are understood, the ugliness of Communism is revealed, its deceit and cunning are exposed, the nature of its activities becomes apparent, and the chances of its success less likely. That is not, of course, the reason why petitioners chose these books for their classrooms. They are fer-

vent Communists to whom these volumes are gospel. They preached the creed with the hope that some day it would be acted upon.'' Mr. Justice Douglas then continued: ''The vice of treating speech as the equivalent of overt acts of a treasonable or seditious character is emphasized by a concurring opinion [Mr. Justice Jackson], which by invoking the law of conspiracy makes speech do service for deeds which are dangerous to society. . . . I repeat that we deal here with speech alone, not with speech *plus* acts of sabotage or unlawful conduct. Not a single seditious act is charged in the indictment. To make a lawful speech unlawful because two men conceive it is to raise the law of conspiracy to appalling proportions. That course is to make a radical break with the past and to violate one of the cardinal principles of our constitutional scheme.''

*I* repeat that in the case at bar we haven't even had speech let alone any facts. Neither prejudice nor hate nor senseless fear should be the basis for abridging freedom of speech. ''Free speech—the glory of our system of government—should not be sacrificed on anything less than plain and objective proof of danger that the evil advocated is imminent.''

American democracy is no accident; it is the majestic product of a vigorous, experimental and passionate history. This nation came into existence as the result of a purposeful struggle against governmental tyranny. The heritage of Thomas Jefferson—''Rebellion to Tyrants is obedience to God''— remains with us, embodied in our institutions and traditions. The spirit of Inquisition, which was abjured in the Declaration of Independence, has always been obnoxious to our political and social life. Equally, it has found no tolerance in our legal codes, our legal traditions, our juridical morality. Due process has meant a fair, legal process. Liberty has meant genuine, concrete liberty for the individual citizen—his right to freedom from search and seizure, his right to privacy, his right to be free of persecutory inquisition on grounds of race, color, creed, political opinion or association.

At this truly grave moment in our nation's growth it is in the power of this court to speak forthrightly in the language of Coke, Camden, and Bradley, in the language of the many illustrious jurists for whom the frenzy of the political market place never blurred the meaning of freedom.

''Under our constitutional system courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered,

or because they are nonconforming victims of prejudice and public excitement. . . . No higher duty, nor more solemn responsibility, rests upon this Court, than that of translating into living law and maintaining this constitutional shield deliberately planned and inscribed for the benefit of every human being subject to our Constitution—of whatever race, creed or persuasion." (*Chambers* v. *Florida* (1940), 309 U.S. 227, 241 [60 S.Ct. 472, 84 L.Ed. 716].)

What is required at this moment of this court is not innovation, but rather a restatement of the glowing principles by which the history of the western world has given dignity to its citizens: "Historical liberties and privileges are not to bend from day to day because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. A community whose judges would be willing to give it whatever law might gratify the impulse of the moment would find in the end that it had paid too high a price." (Cardozo, J., *Matter of Doyle,* 257 N.Y. 244, 268 [177 N.E. 489].)

The issue is momentous, of far-reaching implication, and the ruling of the court will be a categorical imperative whose cumulative effect will be seen only in the fullness of time. "Nothing less is involved than that which makes for an atmosphere of freedom as against a feeling of fear and repression for society as a whole. The dangers are not fanciful. We too readily forget them. Recollection may be refreshed as to the happenings after the first World War by the 'Report Upon the Illegal Practices of the United States Department of Justice,' which aroused the public concern of Chief Justice Hughes (then at the bar), and by the little book entitled 'The Deportations Delirium of Nineteen-Twenty' by Louis F. Post, who spoke with the authoritative knowledge of an Assistant Secretary of Labor." (Frankfurter, J., dissenting, *Harris* v. *United States* (1947), 331 U.S. 145, 173 [67 S.Ct. 1098, 91 L.Ed. 1399].)

Devotion to Americanism often calls for something other than conformity. The plaintiff in the present case knew that to protect the Constitution, indeed merely to invoke its protection for all Americans, required courage, and that hardihood to challenge a wrong done under color of authority was as indispensable to good citizenship as would be, in other circumstances, unquestioning obedience. President Thomas Jefferson wrote to Benjamin Rush in a letter dated April 21, 1803: "It behooves every man who values liberty of con-

science for himself, to resist invasions of it in the case of others; or their case may, by change of circumstances, become his own. *It behooves him, too, in his own case to give no example of concession, betraying the common right of independent opinion, by answering questions of faith* which the laws have left between God and himself.'' (Emphasis supplied.)

In the last analysis, when the moment of decision comes, to the private citizen as well as to the judge, it is in the quiet of his own mind and in the glow of his own courage that Americanism thrives. And it is in the cumulative decision of millions, citizen as well as official, that Americanism is reborn each moment.

For the foregoing reasons, I would reverse the judgment.

Appellant's petition for a rehearing was denied May 22, 1957. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.